<u>**EXHIBIT "A"**</u>

**(Stalking Horse Agreement)**

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this day, February 16, 2011, by and between **Robb & Stucky Limited LLLP**, a Florida limited liability limited partnership with a principal place of business located at 14550 Plantation Rd. Ft. Myers Florida, 33912 (the "Merchant"), and **a joint venture comprised of Hudson Capital Partners, LLC and HYPERAMS, LLC, joint and severally** (collectively, the "Agent").

## RECITALS

WHEREAS, the Merchant operates retail stores in the United States and desires that the Agent act as the Merchant's exclusive agent for the limited purpose of: (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's retail store location(s) identified on **Exhibit 1A** attached hereto (each individually a "Closing Store," and collectively, the "Closing Stores"), and (b) all of the Merchandise located at Merchant's distribution centers identified on **Exhibit 1B** attached hereto (collectively, the "Distribution Centers") that has been or will be transferred by Agent to the Closing Stores, by means of a "going out of business", "store closing", "sale on everything", "everything must go" or similar themed sale (as further described below, the "Sale").

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Definitions and Exhibits

1.1    Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
|---|---|
| Additional Agent Merchandise | Section 8.9(a) (i) |
| Additional Taxes and Penalties | Section 8.3 |
| Adjustment Amount | Section 3.3(a) |
| Agency Accounts | Section 3.3(e) |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agent Indemnified Parties | Section 13.1 |
| Agreement | Preamble |
| Alternate Transaction | Section 16.13 |
| Approval Order | Section 2.3 |
| Augment Recovery Amount | Section 3.1(c) |
| Bankruptcy Code | Section 2.2 |
| Bankruptcy Court | Section 2.2 |
| Benefits Cap | Section 4.1(c) |

| | |
|---|---|
| BOA | Section 3.3 |
| Central Services Expenses | Section 4.1 |
| Closing Store(s) | Recitals |
| Cost File | Section 5.3(a) |
| Cost Value | Section 5.3(a) |
| Defective Merchandise | Section 5.2(b) |
| Designated Deposit Accounts | Section 3.3(e) (ii) |
| Event of Default | Section 14 |
| Estimated Guaranteed Amount | Section 3.3(a) |
| Excluded Benefits | Section 4.1 |
| Excluded Pricing Adjustments | Section 5.3(a) |
| Expenses | Section 4.1 |
| Expense L/C | Section 4.1 |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 8.7(b) (i) |
| Fulfillment Merchandise | Section 5.2(b) |
| Fulfillment Processing Expenses | Section 8.10 |
| Global Inventory Adjustment | Section 5.3(b) |
| GOB Laws | Section 2.3(e) |
| Gross Rings | Section 6.3 |
| Guaranteed Amount | Section 3.1(a) |
| Guaranty Percentage | Section 3.1(a) |
| Guaranty L/C | Section 3.3(d) |
| Initial Guaranty Payment | Section 3.3(a) |
| Inventoried Location(s) | Section 5.1(a) |
| Inventory Completion Date | Section 5.1(a) |
| Inventory Date | Section 5.1(a) |
| Inventory Taking | Section 5.1(a) |
| Inventory Taking Instructions | Section 5.1(a) |
| Inventory Taking Service | Section 5.1(a) |
| Lender | Section 3.3(a) |
| Liens | Section 2.3(c) |
| Merchandise | Section 5.2(a) |
| Merchandise Ceiling | Section 11.1(k) |
| Merchandise Threshold | Section 11.1(k) |
| Merchant | Preamble |
| Merchant Consignment Goods | Section 5.4 |
| Merchant Indemnified Parties | Section 13.2 |
| Minimum Augment Recovery Amount | Section 3.1(c) |
| Occupancy Expenses | Section 4.1 |
| Owned FF&E | Section 15 |
| Proceeds | Section 7.1 |
| Reallocated Fulfillment Merchandise | Section 5.2(b) |
| Recovery Amount | Section 3.1(b) |
| Remaining Merchandise | Section 3.2 |
| Retained Employee | Section 9.1 |

- 2 -

| | |
|---|---|
| Retention Bonus | Section 9.4 |
| Returned Merchandise | Section 8.5 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 8.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Second Lien Lender | Section 3.3 |
| SKU File | Section 11.1(d) |
| Third Party | Section 4.1 |
| Vacate Date | Section 6.2 |
| WARN Act | Section 9.1 |

1.2    Exhibits. The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section Reference | Description |
|---|---|---|
| Exhibit 1A | Recitals | Closing Store Locations |
| Exhibit 1B | Recitals | Warehouse/Distribution Center Location |
| Exhibit 3.3(a) | Section 3.3(a) | Wire Transfer Instructions |
| Exhibit 3.3(d) | Section 3.3(d) | Form of Guaranty L/C |
| Exhibit 4.1(a) | Section 4.1(a) | Occupancy Expense Schedule |
| Exhibit 4.2(b) | Section 4.2(b) | Form of Expense L/C |
| Exhibit 5.1(a) | Section 5.1 | Inventory Taking Instructions |
| Exhibit 8.1 | Section 8.1 | Sale Guidelines |
| Exhibit 10 | Section 10 | Form of Approval Order |
| Exhibit 11.1(c) | Section 11.1(c) | Pre-Existing Liens |
| Exhibit 11.1(l) | Section 11.1(l) | Pending Matters |
| Exhibit 11.1(n) | Section 11.1(n) | Aggregate Cost Values |
| Exhibit 11.1(o) | Section11.1(o) | Inventory Mix |

Section 2.    Appointment of Agent.

2.1    Appointment of Agent.    Effective on the date hereof, the Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E, in accordance with the terms and conditions of this Agreement.

2.2    As soon as practicable after Merchant's execution of this Agreement, Merchant shall apply to the United States Bankruptcy Court for the District in which it commences a chapter 11 case ("Bankruptcy Court") for an order or orders approving this Agreement in its entirety in form and substance reasonably satisfactory to Agent (the "Approval Order"). The Approval Order shall provide, among other things, that: (i) this Agreement is in the best interests

of Merchant, Merchant's estate, creditors, and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon the payment of the Initial Guaranteed Amount and delivery of the Guaranty L/C and Expense L/C, Agent shall be entitled to sell all Merchandise and Owned FF&E (subject to Merchant's rights in Section 15 hereof) at the Inventoried Locations, free and clear of all liens, claims, or encumbrances thereon; (v) upon the payment of the Guaranteed Amount, the Recovery Amount, the Augment Recovery Amount and Expenses and delivery of the Guaranty L/C and the Expense L/C to Lender, subject to Section 16.11, the presently existing liens encumbering all or any portion of the Merchandise or the Proceeds shall attach only to the Guaranteed Amount, the net proceeds from the sale of the Owned FF&E, and amounts reimbursed by the Agent to Merchant on account of Expenses; (vi) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment, and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person; (vii) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, and otherwise promote the Sale as a "store closing", "sale on everything", "everything must go", "going out of business" or similar themed sale, without further consent of any person (other than Merchant as provided for herein), in accordance with the terms and conditions of this Agreement and the form of sale guidelines attached hereto as **Exhibit 8.1** (as the same may be modified and approved by the Bankruptcy Court and subject to the reasonable satisfaction of Agent) and without further compliance with applicable federal, state or local laws governing, *inter alia*, the conduct of store closing sales (the "Liquidation Sale Laws"), other than those designed to protect public health and safety (the "Sale Guidelines"); (viii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, customer lists, and logos relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (ix) each and every federal, state, or local agency, department, or governmental authority with regulatory authority over the Sale and all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including (without limitation) the conducting and advertising of the Sale in the manner contemplated by this Agreement, and no further approval, license, or permit of any governmental authority shall be required; (x) all utilities, landlords, creditors, and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (xi) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xii) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement, and Agent shall have no successor liabilities whatsoever; (xiii) Agent's security interest provided herein and sales of Merchandise shall be protected in the event that the Approval Order is reversed or modified on appeal pursuant to Sections 364(e) and 363(m); (xiv) any amounts owed by Merchant to Agent under this Agreement shall be granted the status of administrative expense claims in Merchant's bankruptcy case pursuant to Section 503(b) and 507(a) of the Bankruptcy Code (herein so called) and secured by valid and perfected first-priority security interests in accordance with and subject to Section 16.11 of this Agreement; (xv) a finding that time is of the essence in entering into the

- 4 -

Agency Agreement and commencing the Sale at the Stores uninterrupted; (xvi) a finding that the Merchant's decisions to (a) enter into this Agreement and (b) make payments required by the Agency Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest; (xvii) a finding that this Agreement was negotiated in good faith and at arms' length between the Merchant and the Agent; (xviii) a finding that Agent's performance and continued performance under this Agreement was and will be, and payment of the Guaranteed Amount under this Agreement was and will be so made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code; and (xix) in the event any or all of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code section 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the liens or priority authorized or created under this Agreement or the Approval Order.

2.3     Except for incurring Expenses in connection with the Sale and as otherwise specifically provided in this Agreement, Agent shall have no authority to enter into any contract, agreement or other arrangement or take any other action, by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent, which consent shall not be unreasonably withheld.

Section 3.     Guaranteed Amount and Other Payments

3.1     Payments to Merchant and Agent.

        (a)     As a guaranty of Agent's performance hereunder, in addition to the payment of Expenses as provided for in Section 4.1 hereof, Agent guarantees that Merchant shall receive the sum of -seventy-five and two tenths percent (75.2%) (the "Guaranty Percentage") of the aggregate Cost Value of Merchandise located in Inventoried Locations (the "Guaranteed Amount"). The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement) and (C) the aggregate Cost Value of the In-Transit Merchandise and/or Reallocated Fulfillment Merchandise and/or Returned Merchandise not otherwise included in the Inventory Taking.

        (b)     To the extent that Proceeds exceed the sum of: (x) the Guaranteed Amount, (y) Expenses of the Sale, and (z) six percent (6%) of the aggregate Cost Value of the Merchandise (the "Agent's Fee") (the sum of (x), (y) and (z), the "Sharing Threshold"), then all remaining Proceeds of the Sale above the Sharing Threshold shall be shared sixty percent (60%) to Merchant and forty percent (40%) to Agent. All amounts, if any, to be received by Merchant from Agent in excess of the Sharing Threshold shall be referred to as the "Recovery Amount".

        (c)     In addition to the Guaranteed Amount, Agent hereby guarantees that the Merchant shall receive the greater of (x) four percent (4%) from the net proceeds of the sale of

- 5 -

Additional Agent Merchandise in the Closing Stores (subject to the terms of Section 8.9 hereof), or (y) $ zero (the "Minimum Augment Recovery Amount"; the greater of (x) or (y), the "Augment Recovery Amount"). For purposes of this Section 3.1(c), "net proceeds" shall be deemed to exclude Sales Taxes, charges to customers for delivery services, and credit card fees associated with the sale of Additional Agent Merchandise.

(d)     Agent shall pay to Merchant the Guaranteed Amount, the Recovery Amount, and the Augment Recovery Amount in the manner and at the times specified in Section 3.3 below.

(e)     Merchant agrees that any undisputed amounts due by Agent to Merchant pursuant to this Section 3 may in Agent's discretion be offset by the undisputed amount of Proceeds which have not, as of the applicable date of payment by Agent to Merchant been transferred by Merchant to Agent.

(f)     To insure accurate sales audit functions, as well as accurate calculations of the Recovery Amount and Augment Recovery Amount, if any, Agent shall be required to utilize Merchant's existing point-of-sale system for recording all sales of goods and Additional Merchandise in the Closing Locations.

3.2     Payments to Agent.     After payment in full of the Guaranteed Amount, the Recovery Amount, the Augment Recovery Amount, and the payment of all Expenses, Agent shall be entitled to retain any remaining Proceeds of the Sale. Provided that no Event of Default has occurred and continues to exist on the part of the Agent, all Merchandise remaining at the conclusion of the Sale shall become the property of Agent, free and clear of all liens, claims and encumbrances of any kind or nature ("Remaining Merchandise"); provided, however, the proceeds realized upon a sale or other disposition of the Remaining Merchandise shall constitute Proceeds hereunder for purposes of, *inter alia*, calculating the Recovery Amount due Merchant.

3.3     Time of Payments; Control of Proceeds.

(a)     Payment of Guaranteed Amount.     On the first business day following entry of the Approval Order, Agent shall pay Bank of America Business Capital ("BOA"), in its capacity as Merchant's secured lender and designee, and in the event that BOA is repaid in full, then the Agent shall pay CIRS Financing LLC and CIRS Management LLC, the holders of a second lien against substantially all of the Merchant's tangible personal property (collectively, the "Second Lien Lender"), (the term "Lender" shall mean, first, BOA, until BOA shall have received payment in full of its claims against Merchant, inclusive of principal, interest, costs and attorney fees and then, second, the Second Lien Lender, until the Second Lien Lender shall have received payment in full of its claims against Merchant, inclusive of principal, interest, costs and attorney fees), ninety (90%) of the Estimated Guaranteed Amount (the "Initial Guaranty Payment"), which amount shall be calculated based upon the estimated aggregate Cost Value of the Merchandise to be included in the Sale, as reflected on Merchant's books and records on the last business day immediately preceding the Sale Commencement Date and after giving effect to the Global Inventory Adjustment (the "Estimated Guaranteed Amount"), with such Initial Guaranty Payment being made by wire transfer to such account(s) as are designated on **Exhibit 3.3(a);** provided, however, if the Initial Guaranty Payment amount exceeds the amount of the

- 6 -

Merchant's indebtedness in favor of Lender, then such excess shall be remitted to the Merchant for the benefit of its junior secured creditor(s). Subject to the foregoing, the balance of the Guaranteed Amount, if any, shall be paid by Agent to the Lender, as Merchant's designee (or the Merchant, as the case may be), on the first business day following the issuance of the final audited report of the aggregate Cost Value of the Merchandise by the Inventory Taking Service, after verification and reconciliation thereof by Agent, Merchant and Lender (the "Final Inventory Report"). Agent's failure to pay such balance shall entitle the Lender to draw upon the Guaranty L/C to the extent of such balance. For the avoidance of doubt, until BOA shall have received payment in full, then, BOA shall be the "Lender" which is entitled to draw upon the Guaranty L/C and, after BOA shall have received payment in full, then, the Second Lien Lender shall be the "Lender" which is entitled to draw upon the Guaranty L/C. In the event that the Final Inventory Report is issued after payment of the Estimated Guaranteed Amount, the Agent or Merchant, as the case may be, shall pay to the Merchant or Agent, as the case may be, the amount (the "Adjustment Amount") by which the actual Guaranteed Amount exceeds or is less than the Estimated Guaranteed Amount actually paid as set forth above, within two (2) business days after the Final Inventory Report has been issued. In the event that the Initial Guaranty Payment exceeds the Guaranteed Amount, Lender agrees to remit to Agent such overpayment within two days after verification and reconciliation of the Final Inventory Report.

(b)     Payment of Augment Recovery Amount. Agent shall tender payment of an amount equal to the Minimum Augment Recovery Amount to the Lender, as Merchant's designee, on the first business day after the Sale Commencement Date. The balance, if any, of the Augment Recovery Amount shall be paid by Agent to Merchant (or its designee) as part of the weekly reconciliation conducted pursuant to Section 8.7(a), and subject to the Final Reconciliation under Section 8.7(b).

(c)     Payment of Recovery Amount. Agent shall tender payment of an amount equal to the Recovery Amount to the Lender, as Merchant's designee, on the first business day after the completion of the Final Reconciliation conducted pursuant to Section 8.7(b).

(d)     Guaranty Security. To secure payment of the balance of any unpaid portion of the Guaranteed Amount, Recovery Amount, Augment Recovery Amount, if any, Agent shall deliver to the Lender (which initially, shall be BOA), as Merchant's designee, an irrevocable standby letter of credit in the original face amount equal to ten percent (10%) of the Estimated Guaranteed Amount, naming the Lender, as Merchant's designee, as the beneficiary, substantially in the form of **Exhibit 3.3(d)** attached hereto (the "Guaranty L/C"). Upon BOA's receipt of payment in full of its claims against the Merchant, BOA shall promptly deliver the Guaranty L/C to the Second Lien Lender. The Guaranty L/C shall be delivered to the Lender, as Merchant's designee, one (1) business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and the Lender. Provided no Event of Default by Merchant has occurred, in the event that Agent shall fail to pay to the Lender, as Merchant's designee, any portion of the Guaranteed Amount, Recovery Amount, or Augment Recovery Amount, if any, as required under this Agreement, or fail to perform any obligation hereunder, the Lender, as Merchant's designee, shall be entitled to draw on the Guaranty L/C to fund such amount or obligation following five (5) days written notice to Agent of the Lender's intention to do so. The Guaranty L/C shall expire no earlier than

- 7 -

sixty (60) days after the Sale Termination Date; provided, that, in the event that at the scheduled expiration date of the Guaranty L/C there remains any unresolved dispute as to the amount of the Guaranteed Amount, Recovery Amount, Augment Recovery Amount, if any, the Lender, as Merchant's designee, may, in its discretion, exercise the right to require Agent to have the expiration date of the Guaranty L/C extended for thirty (30) day intervals (or such other longer duration as Merchant, the Lender and Agent may agree) until such time as the subject dispute has been resolved and any additional amounts due hereunder on account of the Guaranteed Amount, Recovery Amount, Augment Recovery Amount, if any, paid to the Lender, as Merchant's designee; it being agreed that if Agent has for any reason not so extended the expiry date of the Guaranty L/C by the date which is five (5) days prior to the then expiry date, the Lender shall have the right to make a drawing under the Guaranty L/C in an amount equal to the amounts Merchant asserts are then owing to Merchant. Merchant, the Lender, and Agent agree that the face amount of the Guaranty L/C shall be reduced from time-to-time in an amount(s) to be agreed upon by Merchant, the Lender and Agent to account for payment made by the Agent in respect of the Guaranteed Amount, Recovery Amount, if any, and Augment Recovery Amount, as the case may be. Merchant and the Lender further agree that after payment of the Guaranteed Amount, Recovery Amount, Augment Recovery Amount, if any, in full, the Lender shall surrender the original Guaranty L/C to the issuer thereof together with written notification that the Guaranty L/C may be terminated.

(e)     Control of Proceeds.  (i) Within seven (7) business days after the Sale Commencement Date, Agent shall establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder  (the "Agency Accounts") and Merchant shall promptly upon Agent's request execute and deliver all necessary documents to open and maintain the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided, however, upon request, Agent shall deliver to Merchant and/or BOA and the Second Lien Lender copies of all bank statements and other information relating to such accounts. Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all bank fee and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term. Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

(ii)     During the period between the Sale Commencement Date and the date Agent designates the Agency Accounts, all Proceeds of the Sale (including credit card proceeds), shall be collected by Agent and deposited on a daily basis into depository accounts designated by Merchant for the Closing Stores , which accounts shall be designated solely for the deposit of Proceeds of the Sale (including credit card proceeds), and the disbursement of amounts payable by Agent hereunder (the "Designated Deposit Accounts"). Commencing on the first business day following the payment of the Initial Guaranty Amount and the posting of the Guaranty L/C, and on each business day thereafter (or as soon thereafter as is practicable), Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Proceeds deposited into the Designated Deposit Accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date).

- 8 -

Section 4.    Expenses of the Sale

4.1    Expenses.  Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term, which expenses shall be paid by Agent in accordance with Section 4.2 below. Agent and/or Merchant may review or audit the Expenses at any time. Agent shall be obligated to pre-fund any Occupancy Expenses and payroll-related expenses consistent with the Merchant's customary rent and payroll funding practices and timing. As used herein, "Expenses" shall mean all Closing Store -level operating expenses of the Sale which arise during the Sale Term, limited to the following:

(a)    Actual Occupancy Expenses for the Inventoried Locations and Distribution Centers and on a per location and per diem basis in an amount equal to the aggregate per diem totals set forth on **Exhibit 4.1(a)** hereto, *plus* (i) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale and (ii) all of the percentage rent obligations attributable to the sale of Additional Merchandise during the Sale (as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1) incurred by Merchant under applicable leases or occupancy agreements.

(b)    payroll and commissions, if applicable, for all Inventoried Location and Distribution Center Retained Employees used in conducting the Sale (and during the Inventory Taking) as well as payroll for any of Merchant's former employees hired by Agent for the Sale as independent contractors;

(c)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) for Retained Employees used in the Sale, in an amount *equal to* 24.0% of base payroll for all Retained Employees in the Inventoried Locations (the "Benefits Cap");

(d)    Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    actual costs of Agent's employees, independent contractors, on-site supervision, supervisor travel and supervisor bonuses on-site living/housing expenses and all other reasonable compensation paid to such persons;

(f)    banners and in-Store signs which are produced for the Sale;

(g)    promotional costs including, without limitation, advertising, sign walkers and direct mail;

(h)    the costs and expenses of obtaining additional supplies as may be required by Agent in the conduct of the Sale;

(i)    long distance telephone, satellite broadband connections, T-1 lines,

(j)    postage/overnight delivery/courier charges

- 9 -

(k)    copier lease expenses;

(l)    credit card and bank card fees, chargebacks and discounts;

(m)    costs of moving, transferring or consolidating Merchandise between the Inventoried Locations;

(n)    Distribution Center Transfer Costs;

(o)    a pro rata portion for the Sale Term of Merchant's premiums in respect of general liability, casualty, property, inventory, boiler, earthquake and other insurance policies attributable to the Merchandise and the Inventoried Locations and Distribution Centers;

(p)    third party payroll processing fees;

(q)    armored car service, security personnel and monthly alarm services;

(r)    actual cost of Agent's capital and letter of credit fees, insurance costs and corporate travel expenses;

(s)    trash removal and ordinary course third party cleanings;

(t)    Inventoried Location  security and building alarm service;

(u)    Agent's 50% of cost of the physical inventory taking by the Inventory Taking Service;

(v)    costs and expenses of delivery, assembly, repair and touch-up services;

(w)    Central Service Expenses in an amount equal to $20,000 per week for the Sale Term;

(x)    cash shortfalls in registers;

(y)    pest control services;

(z)    routine repair and maintenance costs including landscaping during the term of the Sale; and

(aa)    costs and expenses associated with the acquisition, handling and delivery of any Additional Agent Merchandise.

- 10 -

"Expenses" shall not include: (i) Central Service Expenses in excess of the amount set forth in Section 4.1(v); (ii) Excluded Benefits; (iii) any rent or other occupancy expenses other than Occupancy Expenses in accordance with Section 4.1(a) hereof; (iv) any costs, expenses or liabilities arising during the Sale Term in connection with the Sale of Merchandise, other than the Expenses listed above, all of which shall be paid by Merchant promptly when due during the Sale Term. Notwithstanding anything herein to the contrary, to the extent that any Expense listed in Section 4.1 is also included on **Exhibit 4.1(a),** then **Exhibit 4.1(a)** shall control and such Expense shall not be double counted.

As used herein, the following terms have the following respective meanings:

"Central Services Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale including but not limited to (a) Merchant's inventory control system; (b) payroll system; and (c) accounting system.

"Excluded Benefits" means employee benefits (including vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, ERISA coverage and pension, 401(k) and similar contributions) in excess of the Benefits Cap percentage limitation provided in Section 4.1(c) above.

"Distribution Center Transfer Costs" means, the costs of transferring Merchandise (including, but not limited to freight and labor) to the **Exhibit 1A** Inventoried Location s from the warehouse/distribution center identified in **Exhibit 1B**.

"Occupancy Expenses" means rent, percentage rent, CAM, real estate and use taxes, HVAC, utilities, telecom/telephone charges, POS maintenance, store security systems, repairs and maintenance, taxes and licenses and all other categories of expenses at the Inventoried Location s as set forth in **Exhibit 4.1(a)** attached hereto, up to the specific amounts set forth on **Exhibit 4.1(a)** attached hereto plus: (i) the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale and (ii) all of the percentage rent obligations attributable to the sale of Additional Agent Merchandise during the Sale (as determined in the manner described in the definition of "Occupancy Expenses" below in this Section 4.1) incurred by Merchant under applicable leases or occupancy agreements.

"Third party" means, with reference to any Expenses to be paid to a "third party", a party that is not affiliated with or related to Merchant.

4.2 Payment of Expenses; Security.

(a) All Expenses incurred during each week of the Sale (*i.e.*, Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or offset by Merchant from Proceeds held by Merchant, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7(a) below, based upon invoices and other documentation reasonably satisfactory to Agent; provided, however, Agent shall be obligated to pre-fund any Occupancy Expenses and payroll-related expenses consistent with Merchant's customary rent and payroll funding practices and timing.

- 11 -

(b)       To secure Agent's obligations to pay Expenses, Agent shall deliver to the Lender (which shall initially be BOA), as Merchant's designee, an irrevocable and unconditional standby letter of credit (the "Expense L/C") in an original face amount representing an amount equal to three (3) weeks' estimated Expenses, naming the Lender, as Merchant's designee, as beneficiary (substantially in the form of **Exhibit 4.2(b)**). For the avoidance of doubt, until BOA shall have received payment in full, then, BOA shall be the "Lender" which is entitled to draw upon the Expense L/C and, after BOA shall have received payment in full, then, the Second Lien Lender shall be the "Lender" which is entitled to draw upon the Expense L/C. The Expense L/C shall be delivered to the Lender, as Merchant's designee, no later than one (1) business day after the Sale Commencement Date, shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and Lender. Merchant, the Lender, and Agent agree that at the point where there is less than two (2) weeks remaining in the Sale Term, the face amount of the Expense L/C shall be reduced in amount(s) to be agreed upon by Merchant, the Lender, and Agent; provided, however, the face amount of the Expense L/C shall not be reduced to an amount less than $250,000 until all Expenses shall have been paid by Agent; provided, further, that, in the event that Agent shall have paid to the Lender, as Merchant's designee, all amounts due in respect of Expenses prior to the expiration date of the Expense L/C, the Lender agrees to surrender the original Expense L/C to the issuer thereof together with written notification that the Expense L/C may be terminated.

(c)       In the event that Agent fails to pay any Expense(s) or other amounts payable hereunder when due, or within three (3) business days after Merchant and/or the Lender notifies Agent that any Expense(s) or other undisputed amounts are unpaid and past due, or in the event the Expense L/C will expire within five (5) business days and one or more Expenses or other amounts hereunder are then unpaid, the Lender, as Merchant's designee, shall be entitled to draw on the Expense L/C to fund such unpaid amount. The Expense L/C shall expire not earlier than the date that is sixty (60) days after the Sale Termination Date; provided that, in the event that at the scheduled expiration date of the Expense L/C there remains any unresolved dispute as to the amount of any unpaid Expense hereunder, the Lender, as Merchant's designee, may, in its discretion, exercise the right to cause Agent to have the expiration date of the Expense L/C extended for additional thirty day (30) intervals (or such other longer duration as the Merchant, Lender and Agent may agree) until such time as the dispute has been resolved and any additional amounts due hereunder have been paid to Merchant.

Section 5.       Inventory Valuation; Merchandise.

5.1       Inventory Taking.

(a)       Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU level physical inventory of the Merchandise located in the Closing Stores and the Distribution Centers (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Closing Store and the Distribution Centers (each an "Inventoried Location" and collectively, the "Inventoried Locations") no later than fifteen (15) days after the Sale Commencement Date (the "Inventory Completion Date", and the date of the Inventory Taking at each Inventoried Location being the "Inventory Date" for each such Inventoried Location). Merchant and Agent shall jointly employ RGIS or another mutually

- 12 -

acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking, or if Merchant and Agent mutually agree, shall jointly conduct the Inventory Taking without utilizing a third party inventory taking service. The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed by Merchant and Agent and made a part of this Agreement as **Exhibit 5.1(a)** (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for 50% of the fees and expenses of the Inventory Taking Service, if such service is utilized. The balance of such fees and expenses, if applicable, shall be paid by Merchant. In the event that no third party Inventory Taking Service is utilized, then each of Merchant and Agent shall bear their respective expenses incurred in the Inventory Taking. Except as provided in the immediately preceding sentence as concerns allocation of the costs of the Inventory Taking Service, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking. Merchant, Agent and Lender shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Inventoried Locations, the applicable Inventoried Location shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking has been completed, as agreed by Merchant and Agent. Merchant and Agent further agree that until the Inventory Taking in each particular Inventoried Location is completed, Agent shall not (i) transfer any Merchandise to or from that Inventoried Location, unless Merchant and Agent agree upon a reasonable reporting mechanism to track such movement (ii) deliver any Additional Agent Merchandise to such Inventoried Location , and/or (iii) move Merchandise within or about the Inventoried Locations and/or (iv) remove any Merchant hang tags, price tickets, or inventory control tags affixed to any Merchandise. The Inventory Taking, including, but not limited to, the determination of the aggregate Cost Value of the Merchandise, shall be reconciled by Merchant and Agent within ten (10) days after its completion, and the Agent and Merchant shall use their reasonable best efforts to accomplish such reconciliation within such ten (10) day period; provided, further, that the Final Inventory Report shall be completed not later than thirty (30) days after the Sale Commencement Date. In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following completion of the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 8.7(b)(ii) hereof.

5.2     Merchandise Subject to this Agreement.

(a)     For purposes of this Agreement, including, without limitation, the calculation of the Guaranteed Amount, "Merchandise" shall mean: all finished goods inventory that is owned by Merchant and customarily sold to customers in the ordinary course of Merchant's business, including, but not limited to, (w) Defective Merchandise, (x) Reallocated Fulfillment Merchandise, (y) In Transit Merchandise, and (z) Merchandise subject to Gross Rings.   Notwithstanding the foregoing, "Merchandise" shall not include: (i) Fulfillment Merchandise (except to the extent such merchandise is later re-designated by Merchant as Reallocated Fulfillment Merchandise as provided in Section 8.10 hereof), (ii) goods which belong to sublessees, licensees or concessionaires of Merchant; (iii) goods held by Merchant on memo, on consignment, or as bailee; (iv) furnishings, trade fixtures furniture and equipment and improvements to real property which are located in the Inventoried Locations and (v) Merchandise that is so damaged as to render it unsalable or that represents parts and supplies used in the repair of such Merchandise.

(b)     As used herein, the following terms shall have the respective meanings set forth below:

(i)     "Defective Merchandise" means either (a) inventory that is intended to be sold as part of a set and cannot be sold as an individual piece, and not all of the set is available for sale; provided however that display items and other furniture that can be sold individually shall not constitute "Defective Merchandise", or (b) such item(s) of inventory is non-first quality inventory, mismatched, damaged, dented, scratched, broken, faded, torn, shopworn or soiled inventory, returned, used or previously owned inventory (subject to the limitation provided in section 5.3(b)), and parts (provided that they have assigned to them a SKU in the ordinary course of business).

(ii)     "In Transit Merchandise" means the merchandise on order and not yet received as of the Sale Commencement Date, whether prepaid or not.

(iii)     "Fulfillment Merchandise" means those items of merchandise located in the Inventoried Locations that have been fully or partially reserved from available merchandise and designated by Merchant for fulfillment of customer orders that were received prior to the Sale Commencement Date.   Prior to the Inventory Taking at each Inventoried Location, Merchant shall identify to Agent and segregate from other Merchandise all items of Fulfillment Merchandise at each Inventoried Location, and the Inventory Taking Instructions shall provide that any Fulfillment Merchandise located in an Inventoried Location on the Inventory Date shall not be counted as part of the Inventory Taking. Any revenue generated from the delivery of any Fulfillment Merchandise shall be paid to Merchant.

(iv)     "Reallocated Fulfillment Merchandise" means those items of Fulfillment Merchandise that Merchant reallocates as Merchandise available for the Sale, as provided in Section 8.10 hereof.

5.3     Valuation.

- 14 -

(a)     For purposes of this Agreement, "Cost Value" shall mean with respect to each item of Merchandise: (i) the landed actual cost for such item of Merchandise as reflected in Merchant's master cost file as presented to the Agent during the due diligence process (the "Cost File"); which landed actual cost values Merchant hereby represents and warrants to be inclusive of customs duties and fees, and shipping charges, *plus* (ii) an amount equal to 7.6% of the aggregate Cost Value of the Merchandise representing allocable freight charges attributable to such Merchandise. Items of In Transit Merchandise received in the Inventoried Locations on or prior the date that is twenty one (21) days after the Sale Commencement Date (excluding the Sale Commencement Date for purposes of such calculation), will be included in Merchandise at the applicable Cost Value for each such item; provided, however, that items of In Transit Merchandise received at the Inventoried Locations on or after the date that is twenty two (22) days after the date such In Transit Merchandise is received in such Inventoried Location shall be included in Merchandise at the Cost Value for each such item multiplied by the inverse of the prevailing discount on similar such items of Merchandise as of the date of receipt in the Inventoried Locations. The Cost Value of any item where the "Retail Price" offered to the public on the Sale Commencement is less than the Cost Value in the Master Cost File shall be the Retail Price . The Cost File does not account for any volume discounts, advertising co-op allowances, or discounts associated with expedited payment terms offered by any vendor, and further the Cost Value of any item of Merchandise shall not be adjusted for any such amounts. Merchant and Agent further agree that the Cost File does not account for any Excluded Pricing Adjustments, and no such adjustments shall be taken into account in determining the Cost Value of any item of Merchandise. For purposes of this Agreement, "Retail Price" shall mean the retail price or sale price as determined by the SKUs for such Merchandise as set forth in the SKU File (as defined in Section 11.1(d)); provided however, with respect to the Tampa Store and the Clearance Center, "Retail Price" shall be determined by a physical inventory of such locations and the SKUs for such Merchandise as set forth in the SKU File (as defined in Section 11.1(d)).

(b)     With respect to Defective Merchandise, for purposes of determining the Cost Value thereof, and in lieu of any other adjustments to the Cost Value of Merchandise under this Agreement (*e.g.*, adjustments for Defective Merchandise, clearance merchandise, mis-mates and near-mates, sample merchandise, and/or Excluded Pricing Adjustments), the aggregate Cost Value of the Merchandise shall be adjusted (*i.e.*, reduced) by means of a single global downward adjustment equal to point eight five percent (0.85%) of the aggregate Cost Value of the Merchandise (the "Global Inventory Adjustment").

5.4     Excluded Goods. Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove such goods from the Inventoried Location s prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable. If Merchant elects at the beginning of the Sale Term, Agent shall accept those goods not included as "Merchandise" hereunder and as identified by Merchant for sale as "Merchant Consignment Goods". The Agent shall retain twenty percent (20%) of the sale price (less applicable Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive eighty percent (80%) of the sale price (less applicable Sales Taxes) in respect of such sales. Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly Sale reconciliation by Merchant and Agent

- 15 -

pursuant to Section 8.7(a) below. If Merchant does not elect to have Agent sell such goods not included as Merchandise, then all such items will be removed by Merchant from the Inventoried Location s at its expense as soon as practicable after the date hereof. Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise, including but not limited to sales commissions and percentage rent.

Section 6.    Sale Term.

6.1    Term.  Subject to the Approval Order, the Sale shall commence at the Inventoried Location s on the first day after entry of the Approval Order by the Bankruptcy Court, which shall be entered no later than March 15, 2011 (the "Sale Commencement Date").  The Agent shall complete the Sale, and shall vacate each Inventoried Location's premises in favor of Merchant or its representative or assignee on or before June 30, 2011 (the "Sale Termination Date").  The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term".  The Sale Termination Date as to any Inventoried Location may be (a) extended by mutual written agreement of Agent and Merchant; or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than ten (10) days' advance written notice of any such planned accelerated Sale Termination Date.

6.2    Vacating the Inventoried Locations.  Subject to the terms of Section 6.1 hereof, Agent shall provide Merchant with not less than seven (7) days' advance written notice of its intention to vacate any Inventoried Location   (as to each such Inventoried Location   or Distribution Center, as applicable, the "Vacate Date").  On the Vacate Date, Agent shall vacate in favor of Merchant or its representatives or assignee, remove all Remaining Merchandise and leave the applicable Inventoried Locations in "broom clean" condition (ordinary wear and tear excepted) subject to the right to abandon, neatly in place, the FF&E.  Agent's obligations to pay all Expenses, including Occupancy Expenses, for each Inventoried Location  subject to Vacate Notice shall continue until the later of (a) the applicable Vacate Date for such Inventoried Location   , as applicable, or, (b) the fifteenth (15th) day of the calendar month in which the Vacate Date for such Closing Store , as applicable, occurs in the event the Bankruptcy Court does not approve under the Approval Order Merchant's request to limit the Merchant's obligations to pay rent under such Inventoried Location  leases, as applicable, on a per diem basis through the effective rejection date only, with respect to the Closing Store ; provided, however, to the extent applicable, during the period between the Vacate Date and the fifteenth (15th) day of the calendar month during which the Vacate Date occurs, Agent's obligation to pay Expenses shall be limited to payment of Occupancy Expenses.  All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Closing Stores, as applicable, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of the Agent.  Where reference is made in this Section 6 to vacating the Closing Stores, such shall mean vacating the Closing Stores, as applicable, in favor of Merchant, its representatives or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Closing Store  premises.  Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any Closing Store during the Sale Term, ordinary wear and tear excepted.

- 16 -

6.3     Gross Rings. In the event that the Sale commences prior to the completion of the Inventory Taking at any Closing Store, then for the period from the Sale Commencement Date until the Inventory Date for such Closing Store, Agent and Merchant shall keep a strict count of register receipts and reports to determine the actual Cost Value of the Merchandise sold by SKU. All such records and reports shall be made available to Merchant and Agent during regular business hours upon reasonable notice. Any Merchandise included in the Sale using this Gross Rings method shall be included in Merchandise using the actual Cost Value of the Merchandise sold plus 0.0025 percent (0.25% or twenty-five basis points) shrink provision.

Section 7.     Sale Proceeds.

7.1     Proceeds. For purposes of this Agreement, "Proceeds" shall mean the total amount (in dollars) of all sales of Merchandise made under this Agreement, including the proceeds of any fabric protection sales, but exclusive of (i) Sales Taxes, (ii) charges to customers for delivery services and assembly services, and (iii) returns, allowances and customer credits. All proceeds of Merchant's insurance (net of any deductible) directly attributable to loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term shall constitute Proceeds under this Agreement.

7.2     Credit Card Proceeds. Agent shall be allowed to use Merchant's current credit card systems and servicing arrangements (including Merchant's credit card terminals and processor(s), credit card processor coding,) during the course of the Sale; provided, however, Agent shall establish its own merchant identification numbers as soon as practicable following the Sale Commencement Date; provided further however, Agent shall not be permitted to accept Merchant's proprietary or private label credit card for processing sales of Merchandise in the Closing Stores , unless Agent reaches an agreement with a private label card processor reasonably satisfactory to the Merchant.   Merchant shall process credit card transactions, applying customary practices and procedures.  In the event that Merchant is unable to maintain credit card systems and servicing arrangements, it shall give Agent not less than one (1) weeks' prior notice.  At Agent's request, Merchant shall cooperate with Agent to establish merchant identification numbers under Agent's name to enable Agent to process all credit card sales for Agent's account. Merchant shall deposit the net settlement received from any credit card sales receipts into the Designated Deposit Accounts until Agent opens the Agency Accounts, at which time any credit card sales receipts shall be deposited into the Agency Accounts. Merchant shall prepare a weekly reconciliation of the amounts deposited with respect to the sales of Merchandise by credit plus Sales Taxes less credit card and bank card fees, chargebacks and service charge adjustments, returns allowances and customer credits.  Merchant shall not be responsible for paying and Agent shall pay as an Expense hereunder, all credit card fees charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

Section 8.     Conduct of the Sale.

8.1     Rights of Agent. Subject to the Approval Order, Agent shall be permitted to conduct a "going out of business," "store closing", "bankruptcy liquidation" or similar theme sale at the Inventoried Location s throughout the Sale Term in a manner consistent with the Sale

- 17 -

guidelines ("Sale Guidelines") annexed hereto as **Exhibit 8.1** applicable to the Inventoried Locations, whether by in-store, media advertising, or other promotional materials. In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right:

(a)     except as otherwise provided in the Approval Order, to establish Inventoried Locations' hours, which are consistent with the terms of applicable leases, mortgages or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws;

(b)     to use without charge during the Sale Term (except where otherwise designated as an Expense pursuant to Section 4.1 hereof), all FF&E, bank accounts (other than Agent's obligation to pay bank fees pursuant to Section 3.3(b) hereof), Inventoried Location-level (and to the extent available, corporate), computer hardware and software, mailing lists, existing supplies located at the Inventoried Locations, intangible assets (including Merchant's names), logos and tax identification numbers), Inventoried Locations' keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Inventoried Locations, and any other assets of Merchant located at the Inventoried Locations (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to the Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)     to use Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other central office services necessary for the Sale to the extent that such services are normally provided by Merchant in house, at no cost to Agent (except where otherwise designated as an Expense pursuant to Section 4.1 hereof); provided, however, that in the event Agent requests Merchant to provide services other than those normally provided to the Inventoried Locations and relating to the sale of Merchandise by Merchant in the ordinary course of business and as expressly contemplated by this Agreement, Agent shall be responsible to reimburse Merchant for the actual incremental cost of such services incurred by Merchant as an Expense of the Sale hereunder;

(d)     to establish Sale prices and implement advertising, signage (including exterior banners and signs), and promotional programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, interior and exterior banners and similar signage); provided, however, that not less than three (3) business days prior to the release thereof to the media, Agent shall deliver copies of all advertising materials for the Sale to Merchant who shall have the right, within three (3) business days of such delivery, to approve such materials (which approval shall not be unreasonably withheld or delayed); and provided, further, that the failure of the Merchant to reasonably respond to any request for approval within one two (2) business days of delivery shall be deemed to be approval of the subject materials;

- 18 -

(e)    once the Inventory Taking is complete at both the transferring Inventoried Location and the receiving Inventoried Location, to transfer Merchandise between the Inventoried Locations;

(f)    to supplement the Merchandise at the Closing Locations with Additional Agent Merchandise in accordance with Section 8.9 hereof; and

(g)    to conduct the Closing Store Sales in accordance with the Sale Guidelines attached hereto as **Exhibit 8.1.**

8.2    <u>Terms of Sales to Customers</u>. Subject to Agent's compliance with applicable law, all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same. Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers. All sales will be made only for cash, nationally recognized bank credit cards, and, in Agent's discretion, personal checks, <u>provided</u>, <u>however</u>, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefore.

8.3    <u>Sales Taxes</u>. During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment (other than taxes on income, but specifically including, without limitation, gross receipts taxes) payable to any taxing authority having jurisdiction (collectively, "<u>Sales Taxes</u>") shall be added to the sales price of Merchandise and collected on Merchant's behalf, and provided to Merchant on no less than a bi-weekly basis for deposit in Merchant's existing accounts, trust accounts or other accounts, as designated by Merchant. Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities; <u>provided</u>, <u>however</u>, notwithstanding anything to the contrary herein, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and the like payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale were less than those mandated by applicable law for the sale of Merchandise and/or Owned FF&E, if any, which is sold by Agent under this Agreement (any such additional Sales Taxes and other amounts are collectively referred to herein as "<u>Additional Taxes and Penalties</u>"). Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections. Provided Agent performs its responsibilities in accordance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities. Agent shall add Sales Tax to the sales price of Additional Merchandise and Agent shall collect Sales taxes attributable to the sales of Additional Merchandise and deposit such amounts into existing accounts, trust accounts or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority. If Agent fails to perform its responsibilities in accordance

- 19 -

with this Section 8.3, and provided Merchant complies with its obligations in accordance with this Section 8.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes, remit to Merchant, and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

8.4     Supplies.  Agent shall have the right to use all existing supplies necessary to conduct the Sale (*e.g.,* boxes, bags, twine, but not gift certificates, rain checks, merchandise credits or the like) located at the Inventoried Locations at no charge to Agent. In the event that additional supplies are required in any of the Inventoried Locations during the Sale, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that Merchant shall assist Agent in obtaining supplies from Merchant's vendors at Merchant's cost.

8.5     Returns of Merchandise.  During the first seven (7) days of the Sale Term, Agent shall accept returns of Merchandise sold by Merchant prior to the Sale Commencement Date; provided that (i) such item was purchased within seven (7) days prior to the date of such return; (ii) the customer has the original transaction/register receipt; (iii) such return is not being made in contemplation of such customer repurchasing the item at the sale price being offered by Agent, and (iv) such return is consistent with Merchant's prior practices ("Returned Merchandise"). Agent shall be obligated to maintain and deliver to Merchant a detailed returned merchandise log, including copies of all relevant merchandise receipts and credits, as well as mark the affected merchandise in such a fashion so as to render such merchandise readily identifiable by Merchant and Agent. Merchant shall reimburse Agent in cash or credit against the following week's payment for the amount of any store credit or refund given to any customer in respect of Returned Merchandise.  To the extent Returned Merchandise is saleable; it shall be included in Merchandise and for purposes of the calculation of the Guaranteed Amount and shall be valued at the Cost Value applicable to such item.  Subject to Merchant's reimbursement to Agent of the amount of any store credit or refund granted for any such Returned Merchandise, the aggregate Cost Value of the Merchandise shall be increased by the Cost Value of any Returned Merchandise, and the Guaranteed Amount shall be adjusted accordingly.   If the Returned Merchandise is not saleable, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Guaranteed Amount payable with respect thereto.  Any Returned Merchandise that is not included in Merchandise shall constitute Merchant Consignment Goods and be disposed of by Agent in accordance with Section 5.4 hereof. Any reimbursements due to Agent as a result of Returned Merchandise shall be accounted for and paid by Merchant immediately following the weekly Sale reconciliation pursuant to Section 8.7(a) hereof.  Any increases in payment on account of the Guaranteed Amount as a result of Returned Merchandise shall be paid by Agent pursuant to Section 3.1 hereof.

8.6.     Gift Cards.  Subject to the prior written consent of Lender, during the first fifteen (15) days of the Sale Term, Agent shall accept Merchant's gift cards in an aggregate amount not to exceed $60,000, issued by Merchant prior to the Sale Commencement Date.  Merchant shall

- 20 -

inform Agent when it hits such threshold through its normal reporting procedures. Merchant shall reimburse Agent in cash for such amounts during the weekly sale reconciliation provided for in Section 8.7(a).    For purposes of this Agreement, the term "gift cards" shall not be construed to include credits or discounts relating to the Merchant's Realtor Rewards, customer reward certificates, gift certificates provided to new home buyers or similar programs.

8.7.    Sale Reconciliation.

(a)    Weekly Reconciliation.    On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Expenses, Gross Rings, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent. On a weekly basis, Agent shall also provide Merchant with a report (in electronic format acceptable top Merchant) of the sales of Additional Agent Merchandise, which report shall detail by Inventoried Location, at a minimum, gross and net sales and type of items sold.

(b)    Final Reconciliation.

(i)    Within thirty (30) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, Sales Taxes, Expenses, and any other accountings required hereunder (the "Final Reconciliation"). Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent. In the absence of an order of the Bankruptcy Court, no such disputed amount(s) shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 8.7(b)(ii) hereof. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, Sales Taxes, Expenses and other Sale-related items to review and audit such records.

(ii)    In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution. In the event of a dispute as to (x) or (y) above, Agent shall extend the Guaranty L/C and/or Expense L/C, as the case may be in accordance with the provisions of Section 3.3(e) hereof. If Agent has for any reason not so extended the expiry date of the Guaranty L/C and/or the Expense L/C by the date which is five (5) business days prior to the then expiry date, Lender shall have the right to make a drawing under the Guaranty L/C and/or the Expense L/C, as appropriate, in an amount equal to the amounts Merchant asserts are then owing to Merchant.

8.8    Force Majeure. If any casualty, act of war/ terrorism or act of God prevents the conduct of business in the ordinary course at any Inventoried Location  for a period in excess of five (5) consecutive days, such Inventoried Location  and the Merchandise located at such Inventoried Location  shall be eliminated from the Sale and considered to be deleted from this

- 21 -

Agreement as of the last date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds or consolidated by Agent into another Inventoried Location or Inventoried Location s, and Merchant to the extent actually received shall reimburse Agent for the amount the Guaranteed Amount is so reduced prior to the end of the Sale Term. As noted in the proceeding sentence, Agent will use its commercially reasonable efforts to consolidate and transfer at the expense of the Merchant all Merchandise which is not the subject of insurance proceeds and include said Merchandise in the Sale in other Inventoried Location s.

8.9    Additional Merchandise

(a)  Agent shall be entitled, at its expense, to include in the Sale at the Inventoried Locations additional merchandise procured by Agent that is of like kind and quality to the Merchandise located in the Inventoried Locations (collectively defined as "Additional Agent Merchandise").

(b)    Except as otherwise set forth in this Agreement, at all times and for all purposes, the Additional Agent Merchandise and its proceeds shall be the exclusive property of Agent.   The transactions relating to the Additional Agent Merchandise are, and shall be construed as, a true consignment from Agent to Merchant. The Additional Agent Merchandise shall be at all times subject to the control of Agent. If requested by Agent, Merchant shall, at Agent's expense as an Expense hereunder, insure the Additional Agent Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)    In order to distinguish the Additional Agent Merchandise from the Merchandise located in the Inventoried Locations, Agent shall affix distinctive tags and/or other identifying markings on all items of Additional Agent Merchandise, which shall enable Merchant and Agent to distinguish the sales of the Additional Agent Merchandise from the sale of the Merchandise presently included in the Sale at the Inventoried Locations.  Additionally, Agent shall provide signage in the Inventoried Locations notifying customers that the Additional Agent Merchandise has been included in the Sale.  Agent shall pay for all costs and expenses related to, or incurred in connection with, the marketing and sale of the Additional Agent Merchandise.

8.10    Fulfillment of Pre-Sale Customer Orders.    Agent shall assist Merchant in connection with its efforts to fulfill certain orders placed with Merchant prior to the Sale Commencement Date for which the Merchant has received deposits from the affected customer(s) and with respect to which some or all of the goods related to such orders are on hand at the Inventoried Locations as of the Sale Commencement Date (the "On Hand Fulfillment Orders").  Prior to or during the Inventory Taking, the Fulfillment Merchandise related to On Hand Fulfillment Orders shall be earmarked to fill the respective On Hand Fulfillment Orders and segregated by Merchant and Agent and shall not be made available for sale by Agent. Agent shall use reasonable efforts to fulfill and deliver the On Hand Fulfillments Orders within three (3) weeks after the Sale Commencement Date.  The customary expenses incurred in connection

- 22 -

with the satisfaction of On Hand Fulfillment Orders, including labor and delivery and all sales commissions attributable to the Fulfillment Merchandise (collectively, the "Fulfillment Processing Expenses"), shall be borne by Merchant. Any additional funds received from customers on account of the On Hand Fulfillment Orders, net of Fulfillment Processing Expenses, shall be remitted to Merchant on a weekly basis and included in the weekly reconciliation prepared pursuant to Section 8.7(a) hereunder. Subject to this Section 8.10 hereof, the Fulfillment Merchandise shall be excluded from the definition of Merchandise hereunder. If Merchant elects, Merchant may reallocate items of the Fulfillment Merchandise as Reallocated Fulfillment Merchandise to be included in the Sale, and the Guaranteed Amount shall be adjusted accordingly (it being understood and agreed that the Cost Value of any such Reallocated Fulfillment Merchandise that is re-designated on or prior to the date three (3) weeks after the Sale Commencement Date will be the Cost Value for such item of Merchandise; provided, however, the Cost Value attributable to any Reallocated Fulfillment Merchandise that is so re-designated on or after the date that is three (3) weeks after the Sale Commencement Date shall be the Cost Value for such item multiplied by the inverse of the prevailing discount on similar such items of Merchandise as of the date of the reallocation of such item as Reallocated Fulfillment Merchandise).

Section 9.    Employee Matters.

9.1    Merchant's Employees.  Subject to the applicable provisions of the Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and, with Merchant, schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee") prior to the Sale Commencement Date. Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent. Merchant and Agent agree that except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto); nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees. Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

9.2    Termination of Employees By Merchant.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.  In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for

- 23 -

termination "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable after such termination. From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Closing Stores except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld). Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's treatment of such Retained Employees.

9.3     Payroll Matters.  During the Sale Term, Merchant shall process and pay the base payroll and all related payroll taxes, worker's compensation, employment and unemployment insurance, and benefits for all Retained Employees (except for Agent's employees and independent contractors hired by Agent) in accordance with its usual and customary procedures. At Agent's expense, Merchant shall also process payroll for additional personnel hired by Agent for the Sale.

9.4     Employee Retention Bonuses.  Agent shall pay, as an Expense, retention bonuses ("Retention Bonuses") (which bonuses shall be inclusive of payroll taxes but as to which no benefits shall be payable) up to approximately 10% of base payroll, to certain Retained Employees who do not voluntarily leave employment and are not terminated "for cause".  The amount of such Retention Bonuses, which will be payable within thirty (30) days after the Sale Termination Date, shall be in an amount to be determined by Agent, in its discretion, and shall be processed through Merchant's payroll system.  Agent shall provide Merchant with a copy of Agent's Retention Bonus plan within two (2) business days after the Sale Commencement Date. Agent shall not utilize the Retention Bonus as a mechanism to encourage Retained Employees to act contrary to Merchant's best interests.

Section 10.     Conditions Precedent.

The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)     All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date.

(b)     Agent hereby acknowledges that prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Inventoried Locations.

(c)     Agent hereby acknowledges that prior to the execution of the Agreement, and on the date immediately preceding the Inventory Date, Agent has had and shall have had the opportunity to inspect the Inventoried Location s and the Merchandise.

- 24 -

(d)    The Bankruptcy Court shall have entered the Approval Order substantially the form of **Exhibit 10** attached hereto, mutually acceptable to Merchant and Agent on or before March 15, 2011.

(e)    Notwithstanding anything in this Agreement or any Agency Document to the contrary, the enforceability Agreement is subject in all respect to the Merchant's express written approval and acceptance of any Exhibit or Agency Document not fully executed by the parties and attached hereto.

Section 11.    Representations, Warranties and Covenants.

11.1    Merchant's Representations, Warranties and Covenants.    Merchant hereby represents warrants and covenants in favor of Agent as follows:

(a)    Merchant (i) is a limited liability limited partnership duly organized, validly existing and in good standing under the laws of its jurisdiction of organization; (ii) has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Inventoried Locations are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to the issuance and entry of the Approval Order, Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder. Subject to the issuance and entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Subject to the issuance and entry of the Approval Order, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms. Subject to the issuance and entry of the Approval Order, no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefore, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder. Other than for any consent as shall be obtained prior to the Sale Commencement Date, and those contracts or agreements identified by Merchant to Agent on or prior to the Sale

- 25 -

Commencement Date, if any, no contract or other agreement to which the Merchant is a party or by which the Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement

(c)    Merchant (i) except as set forth on **Exhibit 11.1(c),** owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise free and clear of all liens, claims and encumbrances of any nature and (ii) Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, in each case, except for such pre-existing liens and security interests as shall have been disclosed by Merchant to Agent and identified in **Exhibit 11.1(c)** hereof, which liens and security interests shall, pursuant to the Approval Order, attach only to the Guaranteed Amount, the Recovery Amount, the Augment Recovery Amount, Expenses and any other amounts payable to Merchant hereunder.

(d)    Merchant has maintained its pricing files (including the Cost File) in the ordinary course of business, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns, advertised sales, and other customary in-store promotional or clearance activities). All pricing files and records relative to the Merchandise have been made available to Agent and are accurate in all material respects. The value and sale prices provided to Agent in the file named OH Inventory by LOC and SKU CSV dated as of February 10, 2011 (the "SKU File") are an actual reflection of how such Merchandise is actually tagged and priced in the Closing Stores, other than in the Tampa Store and the Clearance Center. Agent also acknowledges that Merchant has been allowing store level pricing discretion below the value and sales prices at its Clearance Center.

(e)    Merchant shall ticket or mark all items of inventory received at the Closing Stores prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Closing Stores and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(f)    To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state or local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(g)    Subject to the terms of this Agreement and entry of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Inventoried Locations, the assets currently located at the Inventoried Locations to the extent Merchant is entitled to use the same, and the services provided at the Inventoried Locations to the extent Merchant is entitled to such services.

(h)    Since February 15, 2011, Merchant has paid all self-insured or Merchant funded employee benefit programs for Inventoried Locations' employees, including health and

- 26 -

medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(i)     Supplies have not been, since February 15, 2011, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Inventoried Locations so as to alter the mix or quantity of supplies at the Inventoried Location s from that existing on such date, other than in the ordinary course of business.

(j)     Since February 15, 2011, Merchant has not, and shall not, up to the Sale Commencement Date, marked up or raised the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance merchandise, except in the ordinary course of business.

(k)     Merchant has not and shall not purchase or transfer to or from the Inventoried Locations any merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.

(l)     Except as set forth on **Exhibit 11.1(l),** no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(m)     Merchant is not a party to any collective bargaining agreements with its employees; to the best of Merchant's knowledge, no labor unions represent Merchant's employees at the Inventoried Locations; and to the best of Merchant's knowledge, there are currently no strikes, work stoppages or other labor disturbances affecting  the Inventoried Locations or Merchant's central office facilities.

(n)     The aggregate Cost Value, including the freight factor pursuant to section 5.3 herein, of all Merchandise shall not be less than $40.5 million nor greater than $46.1 million, and if the aggregate Cost Value does not fall within that range, the Guarantee Percentage shall be adjusted pursuant to **Exhibit 11.1(n).**

(o)     The departmental mix of the Merchandise on the Sale Commencement Date shall be materially consistent with the mix of the Merchandise pursuant to the due diligence materials provided to Agent described on **Exhibit 11.1(o),** and if such mix is not materially consistent, the Merchant and Agent will negotiate an appropriate adjustment to the Guarantee Percentage to reflect to account for the financial ramifications of such change.

(p)     Merchant will discontinue the clearance sale it is running at its Tampa location as soon as reasonably practicable after the execution of this Agreement, and will remove all signs and "you pay" price tags from such Closing Store upon discontinuance of the event. Merchant agrees to seek authority from the Bankruptcy Court to reject the existing Hilco clearance sale agreement covering the Tampa location in the "first day" pleadings filed in the

- 27 -

bankruptcy case of the Merchant and to stop such clearance sale as soon as possible after the receipt of Bankruptcy Court approval of such rejection of such agreement.

11.2    Agent's Representations, Warranties and Covenants.    Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)    Agent (and each member thereof): (i) is a corporation, partnership, or limited liability company, as the case may be, duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale. Each of the Agency Documents has been duly executed and delivered by the Agent and, constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, provincial, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 12.    Insurance.

12.1    Merchant's Liability Insurance.    Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Inventoried Locations, and shall use best efforts to cause Agent to be named an additional named insured with respect to all such policies. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days

- 28 -

prior notice to Agent of cancellation, non-renewal or material change. In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of Merchant or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors hired by Agent in conjunction with the Sale).

12.2    Merchant's Casualty Insurance. Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date or the Extended Sale Termination Date, as the case may be, without Agent's prior written consent.

12.3    Worker's Compensation Insurance.    Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

12.4    Agent's Insurance. Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Inventoried Locations, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonable satisfactory to Merchant. In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors).

12.5    Risk of Loss. Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Inventoried Locations or the assets located therein or associated therewith, or of Merchant's employees located at the Inventoried Locations, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Agent shall not be deemed to be a successor employer. Merchant and

Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Inventoried Locations during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Inventoried Locations (an "Agent Claim"). In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this Agreement. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the address designated for delivery of notices hereunder.

Section 13.    Indemnification.

13.1    Merchant Indemnification. Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from, or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Merchant):

(a)    Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document (provided, however, Agent shall not be entitled to any indemnity hereunder in the event it is in breach of any of its obligations under any Agency Document representation contained in Section 11.1(n) or Section 11.1(o) hereof, in which case Agent's sole remedy shall be such adjustment to the Guaranteed Amount in accordance with those Sections;

(b)    subject to Agent's performance and compliance with its obligations pursuant to Sections 4.1(b), 4.1(c), and 9 hereof, any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)    subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)    any consumer warranty or products liability claims except to the extent such claims arise from representations made by the Agent relating to the Merchandise;

- 30 -

(e)    the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent) or representatives.

13.2    Agent Indemnification.    Agent shall jointly and severally indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Merchant resulting from, or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Agent):

(a)    Agent's material breach of or failure to comply with any Safety Laws (as defined in the Approval Order) or any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its employees, agents, independent contractors or other officers, directors or representatives of Agent;

(c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

(d)    any Agent Claims;

(e)    in the event that Agent uses any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale, any Additional Taxes and Penalties; and

(f)    the gross negligence or willful misconduct of Agent or any of its officers, directors, employees, agents or representatives.

(g)    any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Merchandise.

Section 14.    Defaults.

The following shall constitute "Events of Default" hereunder:

(a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)    Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term, save for the representations contained in Section 11.1(n) or Section 11.1(o) hereof, in which case Agent's

- 31 -

sole remedy shall be such adjustment to the Guaranteed Amount in accordance with those Sections; or

(c)    Subject to Section 8.8 hereof, the Sale is terminated or materially interrupted or impaired at any Closing Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not effected by the defaulting party.

Section 15.    Fixtures.

With respect to furniture, fixtures and equipment owned by Merchant and located at the Inventoried Locations (collectively, the "Owned FF&E"), Agent shall, at the request of the Merchant,  sell the Owned FF&E in any such Inventoried Locations; provided, however, Merchant, with the consent of the Lenders, shall have the right to designate certain Owned FF&E located at any of the Inventoried Locations that Merchant does not elect to have Agent sell. Agent shall be entitled to receive a commission equal to twenty percent (20%) of the net proceeds from the sale of such Owned FF&E, net of expenses incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between Merchant and Agent; provided, further, however, Merchant may elect to receive, in lieu of proceeds net of expenses and Agent's commission, a lump sum payment, on a per Inventoried Location  basis, in an amount to be agreed upon between Merchant, in consultation with the Lender and Agent, in which case all costs and expenses associated with the disposition thereof shall be borne by Agent.   In either event, as of the Sale Termination Date, Agent may abandon in place in a neat and orderly manner any unsold Owned FF&E at the Inventoried Locations.

Section 16.    Miscellaneous.

16.1    Notices.    All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

If to Agent:

Hudson Capital Partners, LLC
403 C Towne Center Blvd, Suite 3
Ridgeland, MS  39157
Attn: A.R. Williams
Fax: 601-856-9285
Tel: 601-856-9151
Email:arwilliams@hudsoncpl.com

If to the Merchant:

- 32 -

Robb & Stucky Limited, LLLP
Brian Crowley, CFO
14550 Plantation Road
Fort Myers, FL 33912
Fax: (239) 437 5950
Email: Brian.Crowley@RobbStucky.net

With a copy to:

Berger Singerman P.A.
Paul Steven Singerman, Esq.
200 South Biscayne Blvd., 10th Flr
Miami, FL 33131
Fax: (305) 714 4340
Email: singerman@bergersingerman.com

FTI Consulting, Inc.
Kevin Regan
3 Times Square
New York, NY 10036
Fax:    (212) 499-3604
Email: kevin.regan@fticonsulting.com

If to BOA:

Bank of America Business Capital
John M. Olsen
300 Galleria Parkway, Suite 800
Atlanta, GA 30339
Fax:    (404) 607-3277
Email: john.m.olsen@baml.com

With a copy to:

Steven E. Fox, Esq.
Epstein Becker & Greene, P.C.
250 Park Ave.
New York, NY 10177-1211
Fax:    (212) 878-8688
Tel:    (212) 351-3733
Email: sfox@ebglaw.com

If to the Second Lien Lender:

CIRS Financing LLC

- 33 -

CIRS Management LLC
3003 Tamiami Trail North
Suite 400
Naples, Florida 34103

With a copy to:

Thomas E. Lauria, Esq.
White & Case
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 3313102352
Fax: (305) 358-5744
Tel: (305) 371-2700
Email: tlauria@miami.whitecase.com

16.2   Governing Law; Consent to Jurisdiction.   This Agreement shall be governed and construed in accordance with the laws of the State of Florida, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court (and the District Court and Circuit Court of Appeal with appellate jurisdiction over the Bankruptcy Court) shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

16.3   Entire Agreement.   This Agreement and the Exhibits referred to herein and the Agency Documents contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

16.4   Amendments.   This Agreement and the Exhibits referred to herein and the Agency Documents may not be modified except in a written instrument executed by each of the parties hereto.

16.5   No Waiver.   No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

16.6   Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, including, but not limited to, any chapter 11 or chapter 7 trustee. Agent shall not be permitted to assign its obligations under this Agreement.

16.7   Execution in Counterparts. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement. This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

16.8   Section Headings. The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

16.9   Survival. All representations, warranties, covenants and agreements made herein, by the parties hereto, shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

16.10. Termination. This Agreement shall remain in full force and effect until the first to occur of: (i) receipt by Merchant of written notice from Agent that any of the conditions specified in Section 10 hereof have not been satisfied within 5 days of the anticipated Sale Commencement Date set forth in Section 6.1; or (ii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the Final Reconciliation pursuant to Section 8.7(b) above. Notwithstanding the foregoing, (a) the representations, warranties and indemnities of Merchant and Agent contained herein and the provisions of Section 11 above, and (b) any claim arising from a breach of this Agreement prior to its termination, shall survive the termination of this Agreement pursuant to this Section 16.10.

16.11   Security Interest. Upon payment of the Initial Guaranty Payment and issuance of the Guaranty L/C and Expense L/C, and in consideration of the Agent's payment of the Guaranteed Amount, the Recovery Amount and the Augment Recovery Amount, and Expenses, and the provision of services hereunder to Merchant, Merchant hereby grants to Agent a security interest in and lien upon the Merchandise and the Proceeds to secure all obligations of Merchant to Agent hereunder. Until the payment of the Guaranteed Amount, the Recovery Amount and the Augment Recovery Amount, if any, in full, the security interest granted to Agent hereunder shall remain junior to the security interests of BOA and the Second Lien Lender to the extent of the unpaid portion of the Guaranteed Amount, the Recovery Amount, the Augment Recovery Amount and Expenses. Upon entry of the Approval Order and payment of the Initial Guaranty Payment and the issuance of the Guaranty L/C and the Expense L/C, the security interest granted to Agent hereunder shall be deemed a first, priority, priming security interest which is properly perfected without the need for further filings or documentation and which shall prime all liens, claims, encumbrances and security interests ; provided however that (i) no Event of Default by Agent exists and (ii) Agent's perfected security interest shall be subject and subordinate to the liens and security interests of BOA and the Second Lien Lender to the extent of, and with respect to, the continuing performance of Agent's obligations under this Agreement.

- 35 -

16.12  Obligations Joint and Several.  All obligations of Agent to Merchant hereunder shall be joint and several.  Without limiting the foregoing, the liability of Hudson Capital Partners, LLC and HYPERAMS, LLC under this Agreement as "Agent" shall be joint and several liability.  Agent may utilize the services of subcontractors and or licensees in connection with the performance of its obligations hereunder.

16.13  Bidding Procedures/Bankruptcy Matters. In consideration of Agent conducting its due diligence and entering into this Agreement, which serves as a baseline by which other offers may be measured and is subject to higher and better offers by way of a bidding process, all subject to the approval of the Bankruptcy Court and as more fully set forth in the motion to approve this Agreement, this Agreement is subject to the consideration by Merchant of higher or better competing bids.  In the event this Agreement is subject to higher and better offers, Merchant agrees to use the following bidding procedures at any such auction: (i) all bidders must agree to be bound by all of the terms and conditions of this Agreement, with appropriate modifications solely for the identity of the successful bidder, the increased price and/or better terms; (ii) all bidders must provide evidence, satisfactory to the Merchant of the bidder's financial ability to perform its obligations under this Agreement and (iii) the next bid shall provide Merchant incremental value of at least $625,000.  If Agent is not the successful bidder at any such auction, or the Merchant elects to accept an alternative bid or sale mechanism through the Bankruptcy Court (including without limitation, one or more transactions for the purchase of any portion of the Merchant's assets and business as a going concern or otherwise) (the "Alternate Transaction"), then, provided that each of the Break-Up Fee Conditions (hereinafter defined) are satisfied as determined by the Bankruptcy Court, then, upon the payment of the successful bidder of the "Initial Guaranty Payment" or the "Purchase Price" under the Alternate Transaction, then, the Merchant shall pay the Agent a combined break-up fee and expense reimbursement of $475,000, subject to the approval of such amount by the Bankruptcy Court (which approval shall be requested by Merchant as part of the "first day" relief requested by Merchant in its bankruptcy proceeding).

As used herein, the term "Break-Up Fee Conditions" shall mean the collective reference to the following: (a) Agent shall have agreed to be the "back up bidder" to the winning contract in the event the winning bidder fails to fund the guaranteed amount pursuant to the terms of the winning contract for any reason or for no reason, provided however, that the "back up" bid by the Agent shall be the last bid made by the Agent at the auction, or if no additional bid was made by the Agent at the auction, then the bid contained in this Agreement by the Agent, (b) Agent shall have complied with the terms of this Agreement as of the date of the bankruptcy auction in the Merchant's bankruptcy case, (c) any subsequent bids made by the Agent at the bankruptcy auction in the Merchant's bankruptcy case shall be without modification to the terms and provisions of this Agreement, except to increase the incremental value payable to Merchant under this Agreement or as otherwise may be approved by Merchant in writing or in person during the conduct of such bankruptcy auction and (d) the winning bidder (if the winning bidder is not the Agent), shall have funded the entire guaranteed amount under the winning contract pursuant to the terms thereof.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

- 36 -

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**Hudson Capital Partners, LLC**

By: _____

Name: _____

Title: _____

**HYPERAMS, LLC**

By: _____

Name: _____

Title: _____

**MERCHANT:**

**Robb & Stucky Limited LLLP**

By: _____

Name: Brian F. Crawley

Title: CFO

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

### AGENT:

**Hudson Capital Partners, LLC**

By: _____
    Name: _____
    Title: _____

**HYPERAMS, LLC**

By: _____
    Name: _____
    Title: _____

### MERCHANT:

**Robb & Stucky Limited LLLP**

By: Derby Road Investments, Inc., its General Partner

By: _____
   Name:
   Title:

By: R&S GP, LLC, its General Partner

By: _____
   Name:
   Title:

- 37 -

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**AGENT:**

**Hudson Capital Partners, LLC**

By: _____
     Name: _____
     Title: _____

**HYPERAMS, LLC**

By: _Thomas E. Pabst_
     Name: _Thomas E. Pabst_
     Title: _HYPERAMS, LLC_

**MERCHANT:**

**Robb & Stucky Limited LLLP**

     By: Derby Road Investments, Inc., its General Partner

     By: _____
       Name:
       Title:

     By: R&S GP, LLC, its General Partner

     By: _____
       Name:
       Title:

- 37 -

3481796-5

**Signature Page to Agency Agreement for Robb & Stucky Limited LLLP**
**(continued)**

**THE PROVISIONS OF SECTION 3.3(d) AND 16.11**
**ARE HEREBY CONSENTED AND AGREED TO:**

**BANK OF AMERICA BUSINESS CAPITAL**
**As BOA**

By: _____

    Name: _____

    Title: _____

**CIRS FINANCING LLC,**
As Second Lien Lender

By: _____

    Name: _John D. O'Connor_

    Title: _Vice President_

**CIRS MANAGEMENT LLC,**
As Second Lien Lender

By: _____

    Name: _John D. O'Connor_

    Title: _Vice President_

- 38 -

## EXHIBIT 1A

**Closing Store Locations**

Exhibit 1A
Closing Store Locations

| # | LOC | STORE # | GL# | NAME | ADDR 1 | ADDR 2 | CITY | ST | ZIP |
|---|-----|---------|-----|------|--------|--------|------|----|----|
| 1 | S1 | 01 | 01 | FORT MYERS STORE | 13170 S CLEVELAND AVE | | FORT MYERS | FL | 33907 |
| 2 | S2 | 02 | 02 | NAPLES STORE | 2777 TAMIAMI TRAIL N | | NAPLES | FL | 34103 |
| 3 | S4 | 04 | 04 | ORLANDO-ALTAMONTE STORE | 351 S SR 434 | | ALTAMONTE SPRINGS | FL | 32714 |
| 4 | S6 | 06 | 06 | SARASOTA STORE | 7557 S TAMIAMI TRAIL | | SARASOTA | FL | 34231 |
| 5 | S7 | 07 | 07 | PALM BEACH GARDENS STORE | 3801 DESIGN CENTER DRIVE | | PALM BEACH GARDENS | FL | 33410 |
| 6 | S8 | 08 | 18 | SCOTTSDALE STORE | 15440 N SCOTTSDALE RD | | SCOTTSDALE | AZ | 85254 |
| 7 | T1 | 15 | 08 | PLANO STORE | 7240 N DALLAS PKWY | | PLANO | TX | 75024 |
| 8 | T3 | 16 | 10 | BOCA RATON | 200 PLAZA REAL | | BOCA RATON | FL | 33432 |
| 9 | T4 | 19 | 03 | TAMPA STORE | INTERNATIONAL PLAZA #400 | 2223 WESTSHORE BLVD | TAMPA | FL | 33607 |
| 10 | T5 | 20 | 20 | BONITA SPRINGS STORE | 3181 N BAY VILLAGE CT | | BONITA SPRINGS | FL | 34135 |
| 11 | T8 | 27 | 27 | ORLANDO-MILLENIA STORE | 4088 MILLENIA BLVD | | ORLANDO | FL | 32839 |
| 12 | U4 | 34 | 34 | LAS VEGAS | 6521 LAS VEGAS BLVD S | | LAS VEGAS | NV | 89119 |
| 13 | P1 | 10 | 15 | FORT MYERS PATIO | 14380 S TAMIAMI TRAIL | | FORT MYERS | FL | 33912 |
| 14 | P2 | 11 | 16 | NAPLES PATIO | 2840 TAMIAMI TRAIL N | | NAPLES | FL | 34103 |
| 15 | P3 | 12 | 17 | SARASOTA PATIO | 7501 S TAMIAMI TRAIL | | SARASOTA | FL | 34231 |
| 16 | P4 | 14 | 14 | SCOTTSDALE PATIO | 15401 N 71ST ST | | SCOTTSDALE | AZ | 85254 |
| 17 | P5 | 17 | 12 | BONITA SPRINGS PATIO | 26501 S TAMIAMI TRAIL | | BONITA SPRINGS | FL | 34135 |
| 18 | P6 | 18 | 13 | BOCA RATON PATIO | 906 N FEDERAL HIGHWAY | | BOCA RATON | FL | 33432 |
| 19 | P7 | 22 | 22 | ORLANDO-MILLENIA PATIO | 4094 MILLENIA BLVD | | ORLANDO | FL | 32839 |
| 20 | S3 | 03 | 09 | FORT MYERS OUTLET | 4740 S CLEVELAND AVE | | FORT MYERS | FL | 33907 |

## EXHIBIT 1B

**Warehouse/Distribution
Center Location**

**Exhibit 1B**
**Warehouse/Distribution Center Locations**

| # | LOC | GL# | NAME | ADDR 1 | CITY | ST | ZIP |
|---|-----|-----|------|--------|------|-----|-----|
| 1 | W1 | 41 | FORT MYERS WAREHOUSE | 14550 PLANTATION ROAD | FORT MYERS | FL | 33912 |
| 2 | W3 | 43 | TEMPE WAREHOUSE | 455 W DIAMOND DR #106 | TEMPE | AZ | 85283 |
| 3 | W4 | 42 | LINCOLNTON WAREHOUSE | 3300 FINGER MILL RD | LINCOLNTON | NC | 28092 |
| 4 | W6 | 46 | DALLAS WAREHOUSE | 151 REGAL ROW, #128 | DALLAS | TX | 75247 |

## EXHIBIT 3A

**Wire Transfer Instructions**

**EXHIBIT 3.3(d)**

**Form of Guaranty L/C**

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2011

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:

Credit Number:
Opener's Reference No:

Gentlemen:

BY ORDER OF:    {Agent's Name}
We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit")
for the account of {Agent's Name} for a sum or sums not exceeding a total of $_____ U.S.
Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective
immediately and expiring at OUR COUNTERS on _____, 2011, or such earlier date
on which the beneficiary shall notify us in writing that this Letter of Credit shall be terminated
accompanied by the original Letter of Credit (the "Expiry Date").
Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in
the form attached hereto as **Exhibit A** signed by Robb & Stuckey Limited, LLLP (the
"Merchant").
This Letter of Credit may be reduced from time to time when accompanied by a signed statement
from beneficiary in the form attached as **Exhibit B**.
Partial and/or multiple drawings are permitted.
Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____
dated _____ of [NAME AND ADDRESS OF ISSUING BANK]."
Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform
Customs and Practices for Documentary Credits (1993 Revision), International Chamber of
Commerce Publication No. 500".
We hereby agree that drafts drawn under and in compliance with the terms of this Letter of
Credit will be duly honored if presented to the above mentioned drawee bank on or before the
Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

- 43 -

<u>EXHIBIT A</u>

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Drawing for Amounts Due to:

[Insert Beneficiary Name and Beneficiary Bank here]


Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officer of Robb & Stucky Limited, LLLP, a debtor and debtor-in-possession (the "Merchant" and the "Beneficiary"), and the Beneficiary of the Letter of Credit hereby certifies to you that:

        (i)        {Agent's Name} (the "Agent") has not made a payment when due of or for Guaranteed Amount or other amounts due by Agent to Merchant pursuant to, and as such term is defined in that certain Agency Agreement dated as of _____, 2011 among the Merchant, on the one hand, and Agent, on the other.

        (ii)      The amount to be drawn is $_____ (the "Amount Owing").

        (iii)     Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof .

        (iv)     The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

        (v)      The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

[ _____ ]
[ _____ ]
[ _____ ]
Further Credit to:  [Account Title]
[Account No.]

- 44 -

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2011.

Very truly yours,

Robb & Stucky Limited, LLLP

By: _____

      Name:
      Title:

[Insert Bank Name Here]

By: _____

      Name:
      Title:

3481796-5

## **EXHIBIT B**

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

[Insert Beneficiary Name and Address and Contact information here]

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officers of Robb & Stucky Limited, LLLP and [Insert Bank Name here] (collectively, the "Beneficiaries"), hereby confirm to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2011.

<div style="margin-left:40%">

Very truly yours,

Robb & Stucky Limited, LLLP

By: _____
     Name:
     Title:


[Insert Bank Name Here]

By: _____
     Name:
     Title:

</div>

**EXHIBIT 4.1(a)**

**Occupancy Expense Schedule**

- 2 -

Exhibit 4.1(a)
Occupancy Expense Schedule

| STORE # | Store Name | Rent[1] | Bldg/Grounds Maint[2] | Utilities[3] | Telephone[4] | Taxes / Licenses[5] | Total |
|---|---|---|---|---|---|---|---|
| 01 | Fort Myers | $ 3,105 | $ 255 | $ 276 | $ 106 | $ 312 | $ 4,054 |
| 02 | Naples | 1,982 | 349 | 439 | 107 | 365 | 3,241 |
| 03 | Fort Myers Outlet | 581 | 68 | 137 | 24 | 262 | 1,072 |
| 04 | Orlando-Altamonte | 2,000 | 311 | 398 | 53 | 460 | 3,222 |
| 06 | Sarasota | 1,866 | 103 | 230 | 56 | 316 | 2,572 |
| 07 | Palm Beach Gardens | 1,635 | 401 | 297 | 64 | 783 | 3,181 |
| 08 | Scottsdale | 5,452 | 566 | 681 | 68 | 998 | 7,765 |
| 10 | Fort Myers Patio | 387 | 46 | 28 | 25 | 73 | 560 |
| 11 | Naples Patio | 474 | 60 | 59 | 21 | 74 | 687 |
| 12 | Sarasota Patio | 407 | 51 | 27 | 13 | 67 | 565 |
| 14 | Scottsdale Patio | 686 | 95 | 97 | 18 | 66 | 962 |
| 15 | Plano | 3,884 | 462 | 569 | 70 | 991 | 5,976 |
| 16 | Boca Raton | 3,171 | 372 | 402 | 78 | 674 | 4,697 |
| 17 | Bonita Springs Patio[6] | 773 | 97 | 125 | 24 | 137 | 1,157 |
| 18 | Boca Raton Patio | 538 | 214 | 55 | 9 | 149 | 965 |
| 19 | Tampa | 2,202 | 557 | 619 | 52 | 86 | 3,517 |
| 20 | Bonita Springs | 1,250 | 848 | 281 | 53 | 264 | 2,695 |
| 22 | Orlando Millenia Patio[6] | 396 | 100 | 81 | 14 | 48 | 640 |
| 27 | Orlando-Millenia[6] | 1,586 | 147 | 154 | 30 | 200 | 2,117 |
| 34 | Las Vegas | 3,480 | 405 | 310 | 60 | 184 | 4,439 |
| | **Total Stores** | 35,855 | 5,509 | 5,268 | 944 | 6,509 | 54,084 |
| W1 | Fort Myers Warehouse[7] | 2,548 | 87 | 227 | 118 | 753 | 3,733 |
| W3 | Tempe Warehouse | 1,097 | 223 | 107 | 70 | 232 | 1,729 |
| W4 | Lincolnton Warehouse | 1,083 | 170 | 405 | 33 | 236 | 1,926 |
| W6 | Dallas Warehouse | 114 | 74 | 47 | 32 | 134 | 401 |
| | **Total Warehouses** | 4,842 | 553 | 786 | 253 | 1,355 | 7,789 |
| | **Grand Total** | $ 40,697 | $ 6,062 | $ 6,053 | $ 1,197 | $ 7,864 | $ 61,873 |

Notes:
1    Based on current lease amendments
2    Based on forecasted rates for the March through June period
3    Based on forecasted rates for the March through June period
4    Based on forecasted rates for the March through June period
5    Based on forecasted rates for the March through June period
6    Owned property, based on current mortgage rate
7    Shared facility with corporate office, rent represents 60% of the total lease

## EXHIBIT 4.2(b)

### Form of Expense L/C

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2010

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:      [Insert Beneficiary name, address and contact information here]

Credit Number:
Opener's Reference No:

BY ORDER OF:      {Agent's Name}

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of {Agent's Name} for a sum or sums not exceeding a total of $ _____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2011 or such earlier date on which the beneficiary shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by Robb & Stucky Limited, LLLP (the "Merchant").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from Beneficiary in the fowl attached as **Exhibit B**.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____ dated _____ of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500".

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

- 4 -

EXHIBIT A

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____
Re: Drawing for Amounts Due to:

[Insert Beneficiary name, address and contact information here]

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officer of Robb & Stucky Limited, LLLP, a debtor and debtor-in-possession (the "Merchant" and the "Beneficiary"), and the Beneficiary of the Letter of Credit hereby certifies to you that:

(i)      {Agent's Name} (the "Agent") has not made a payment when due of or for Expenses or other amounts due by Agent to Merchant pursuant to, and as such term is defined in that certain Agency Agreement dated as of _____, 2011 among the Merchant, on the one hand, and Agent, on the other.

(ii)      The amount to be drawn is $_____ (the "Amount Owing").

(iii)      Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof.

(iv)      The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)      The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

[_____]
[_____]
[_____]
Further Credit to: [Account Title]
[Account No.]

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2011.

Very truly yours,

Robb & Stucky Limited, LLLP

By: _____
      Name:
      Title:

EXHIBIT B

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount

[Insert Beneficiary name, address and contact information here]

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officer of Robb & Stucky Limited, LLLP (the "Beneficiary"), hereby confirms to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of

$ _____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2011.

<div style="text-align:right">

Very truly yours,

Robb & Stucky Limited, LLLP

By: _____

     Name:
     Title:

</div>

3481796-5

## EXHIBIT 5.1(a)

**Inventory Taking Instructions**

4

**EXHIBIT 8.1**

**Sale Guidelines**

# ROBB & STUCKY LIMITED, LLLP

Section 1.    **CLOSING STORE – SALE GUIDELINES**

The following procedures shall apply to the Sale[1] to be held at the Closing Locations:

1.    The Sale shall be conducted so that the Closing Locations in which sales are to occur remain open no longer than the normal hours of operation provided for in the respective leases or other occupancy agreements for the Closing Locations.

2.    The Sale shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Sale shall be conducted on Sunday unless the Merchant had been operating such Closing Locations on a Sunday.

3.    In order to maintain a desired mix of Merchandise in the Closing Locations, Merchant and the Agent shall be permitted to augment or otherwise bring new merchandise into the Closing Locations only, including, without limitation, rugs, wall coverings, bedding and accessories; provided, however, additional merchandise procured by Agent shall be similar in nature to the Merchandise located in the Closing Locations. In order to distinguish the Additional Agent Merchandise from the Merchandise located in the Closing Locations, Agent shall affix distinctive tags and/or other identifying markings on all items of Additional Agent Merchandise, which shall enable Merchant, Agent and customers to distinguish the sales of the Additional Agent Merchandise from the sale of the Merchandise presently included in the Sale at the Closing Locations. Additionally, Agent shall provide signage in the Closing Locations notifying customers that the Additional Agent Merchandise has been included in the Sale.

4.    All display and hanging signs used by the Merchant and the Agent in connection with Sale shall be professionally produced and all hanging signs shall be hung in a professional manner. The Merchant and the Agent may advertise the Sale as a "going out of business", "store closing" or similar theme sale at the Closing Locations as provided by the Agency Agreement. The Merchant and the Agent shall not use neon or day-glo signs. Furthermore, with respect to enclosed mall locations no signs in common areas of a mall shall be used. Nothing contained herein shall be construed to create or impose upon the Merchant and the Agent any additional restrictions not contained in the applicable lease or other occupancy agreement. In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at non-enclosed mall Closing Locations or at

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agency Agreement.

5

enclosed mall Closing Locations if such Closing Location has an independent entrance from the parking lot; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected store and shall not be wider than the storefront of the Closing Store. In addition, the Merchant and the Agent shall be permitted to utilize sign walkers and street signage, notwithstanding any state, county or local law or ordinance.

5.      Conspicuous signs shall be posted in the cash register areas of each Closing Store to the effect that all sales are "final" and that customers with any questions or complaints subsequent to the conclusion of the Sale may contact a named representative of the Merchant or the Agent at a specified telephone number.

6.      The Agent shall not distribute handbills, leaflets or other written materials to customers outside of any of the Closing Locations, unless permitted by the applicable lease or, if distribution is customary in the shopping center in which the Closing Store is located. Otherwise, the Agent may solicit customers in the Closing Locations themselves. The Agent shall not use any flashing lights or amplified sound to advertise the Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

7.      At the conclusion of the Sale, Agent shall vacate the Closing Locations in "broom-clean" condition, and shall otherwise leave the Closing Locations in the same condition as on the commencement of the Sale, ordinary wear and tear excepted; provided, however, that the Merchant and/or the Agent shall be authorized to leave any Abandoned Property (as that term is defined herein) in the Closing Locations; provided, further, that the Merchant hereby does not undertake any greater obligation than as set forth in an applicable lease with respect to a Closing Store. The Merchant may abandon any FF&E or other materials (the "Abandoned Property") not sold in the Sale at the Closing Store premises at the conclusion of the Sale. Any Abandoned Property left in a Closing Store after a lease is rejected shall be deemed abandoned with the landlord having the right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord and without waiver of any damage claims against the Merchant.

8.      Subject to Section 15 of the Agency Agreement, the Merchant and/or the Agent may sell Owned FF&E owned by the Merchant and located in the Closing Locations during the Sale. Subject to Section 15 of the Agency Agreement, the Merchant or the Agent, as the case may be, may advertise the sale of Owned FF&E consistent with the guidelines provided in paragraphs 4 and 6 hereof. Additionally, the purchasers of any Owned FF&E sold during the Sale shall only be permitted to remove the Owned FF&E either through the back shipping areas or through other areas after store business hours.

9.      Landlords will be provided with the name and telephone number of a representative of the Merchant to notify of any problem arising during the Sale.

6

10. The Agent shall not make any alterations to interior or exterior Closing Store lighting. No property of any landlord of a Closing Store shall be removed or sold during the Sale. The hanging of exterior banners or other signage shall not constitute an alteration to a Closing Store.

11. At the conclusion of the Sale at each Closing Store, pending assumption or rejection of applicable leases, the landlords of the Closing Locations shall have reasonable access to the Closing Store premises as set forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Closing Locations.

12. Post-petition rents shall be paid and other lease obligations shall be performed by the Merchant as required by the Bankruptcy Code, except as modified pursuant to the Approval Order, until the rejection or assumption and assignment of each lease.

13. The rights of the landlords for any damages to the Closing Locations shall be reserved in accordance with the applicable leases.

14. The Merchant shall notify a representative of the relevant landlord of the date on which the Sale is scheduled to conclude at a given Closing Location, within three business days of the Merchant's receipt of such notice from the Agent.

15. The Merchant and/or the Agent may conduct one or more auctions of Merchandise and/or Owned FF&E from the Closing Locations.

16. To the extent a conflict exists between the terms and provisions of this Exhibit 8.1 and the Agency Agreement, then, the terms and provisions of the Agency Agreement shall govern and control.

\* \* \* \* \* \* \*

7

## EXHIBIT 10

**Form of Approval Order**

8

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

ROBB & STUCKY LIMITED LLLP,
a Florida Limited Liability Limited Partnership,[1]

        Debtor.

Case No.
Chapter 11

_____/

**ORDER APPROVING AGENCY AGREEMENT,
STORE CLOSING SALES AND RELATED RELIEF**

**THIS MATTER** came before the Court on the 8th day of March, 2011 at 1:00 p.m in

Tampa, Florida, upon the *Debtor's Emergency Motion Pursuant to Sections 105(a), 363, and*

*365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 for (I) Approval of*

*Procedures in Connection With the Sale of All or Substantially All of the Debtors' Assets,*

*(II) Authorization to Enter Into Stalking Horse Agreement in Connection Therewith,*

*(III) Approval of the Payment of Stalking Horse Protections, and (IV) the Setting of Related*

*Auction and Hearing Dates* [D.E. ____] (the "Motion");[2] and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C.

§§ 1408 and 1409; and due and proper notice of the Motion having been provided to (i) the

Office of the United States Trustee for the Middle District of Florida, (ii) the attorneys for BOA,

---

[1] The last four digits of the taxpayer identification number for the Debtor are 6415. The mailing address for the Debtor is 14550 Plantation Road, Fort Myers, FL 33912.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Motion or in that certain Agency Agreement dated February 16, 2011, by and between the Debtor and a joint venture comprised of Hudson Capital Partners, LLC and HYPERAMS, LLC (the "**Agency Agreement**"), annexed to the Motion as **Exhibit A**.

(iii) the attorneys for the Second Lien Lender, (iv) the attorneys for the Third Lien Lender,

(v) those creditors holding the 20 largest unsecured claims against the Debtor's estate, (vi) all

Interested Parties, (vii) all attorney general's offices in the states in which the Debtor does

business, (viii) all county attorney's offices in the counties in which the Debtor does business;

and (ix) all other and all affected federal and local regulatory and taxing authorities, including

the Internal Revenue Service, and it appearing that no other or further notice need be provided;

and a hearing (the "**Hearing**") having been held to consider the relief requested in the Motion;

and the appearances of all interested parties having been noted in the record of the Hearing; and

upon the *Declaration of Kevin F. Regan in Support of First Day Pleadings*, and all of the

proceedings had before the Court; and the Court having found and determined that the relief

sought in the Motion is in the best interests of the Debtor, its estate and creditors and all parties

in interest, and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

FOUND AND DETERMINED THAT:

     A.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and

1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and this

Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

     B.     The statutory predicates for the relief requested are sections 105(a) and 363 of the

Bankruptcy Code and Rules 2002, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**").

     C.     The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the findings of fact

constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.      Notice of the Motion and of the Hearing was given in accordance with the directive of the Court and as otherwise required by applicable law, as evidenced by the affidavits of service on file with the Clerk of the Court.

E.      The notice of the Motion and of the Hearing was adequate and sufficient under the circumstances, and any otherwise applicable requirement for notice is hereby waived and dispensed with. A reasonable opportunity to object or to be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities.

F.      As demonstrated by testimony proffered at the Hearing and representations of counsel to the Debtor and other parties in interest made at the Hearing, the Debtor has conducted the bidding solicitation and auction process fairly, with adequate opportunity for interested parties to submit Qualified Bids and in compliance with this Court's *Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 (I) Approving Procedures in Connection With the Sale of All or Substantially All of the Debtor's Assets, (II) Authorizing the Debtors to Enter Into Stalking Horse Agreement in Connection Therewith, (III) Approving the Payment of Stalking Horse Protections, And (IV) Setting Related Auction and Sale Hearing Dates*, entered on February ___, 2011 [D.E. ____].

G.      The offer of the Agent, upon the terms and conditions set forth in the Agency Agreement, including the form and total consideration to be realized by the Debtor pursuant to the Agency Agreement, (i) is the highest and best offer received by the Debtor;  (ii) is fair and reasonable; and (iii) is in the best interests of the Debtor's estates.

H.      The transactions contemplated by the Agency Agreement do not include the sale or lease of personally identifiable information, as defined in Section 101(41A) of the Bankruptcy Code ("**Personally Identifiable Information**") (or assets containing personally identifiable information).

I.      The Debtor (i) has full corporate power and authority to execute and deliver the Agency Agreement and all other documents contemplated thereby, and the Sale of the Debtor's Merchandise has been duly and validly authorized by all necessary corporate action of the Debtor, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Agency Agreement, and (iii) has taken all corporate action necessary to authorize and approve the Agency Agreement and the consummation of the transactions contemplated thereby.  No consents or approvals, other than those expressly provided for in the Agency Agreement, are required for the Debtor to consummate such transactions.

J.      The Agency Agreement was negotiated and entered into in good faith, based upon arm's length bargaining, and without collusion or fraud.  Neither the Debtor nor the Agent has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate Section 363(n) of the Bankruptcy Code to the Agency Agreement or to the consummation of the transactions contemplated thereby.

K.      The Debtor was free to deal with any other party interested in liquidating some or all of the Debtor's assets.  The Agent has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, the Agent has not acted in a collusive manner with any person and the Agent was not controlled by any agreement among bidders.  The Agent is not an

"insider" as that term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling stockholders exists between the Agent and the Debtor.

Now, therefore, it is hereby

ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is granted to the extent provided herein. All objections to the Motion that have not been withdrawn, waived, settled, or specifically addressed in this Order, and all reservations of rights included in such objections, are overruled in all respects on the merits and denied.

2.    The Debtors are hereby authorized and empowered to enter into the Agency Agreement, and the Agency Agreement is hereby approved in its entirety and is incorporated herein by reference. All amounts payable to the Agent under the Agency Agreement shall be payable to the Agent without the need for any application of the Agent therefor or a further order of the Court.

3.    The Debtor and the Agent are hereby authorized, pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sale at the Stores in accordance with the Agency Agreement and the Sale Guidelines, which Sale Guidelines are hereby approved in the form attached to the Agency Agreement.

4.    Except as otherwise provided in the Agency Agreement, pursuant to Section 363(f) of the Bankruptcy Code, the assets being sold pursuant to the Agency Agreement shall be sold free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in Section 101(5) of the Bankruptcy Code), including, without limitation, the liens and security interests of BOA and

the Second Lien Lender, whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which this chapter 11 case was commenced (collectively, the "Liens"), with such Liens to attach to the Guaranteed Amount, the Recovery Amount and any other amounts payable to the Debtor under the Agency Agreement (collectively, the "**Transaction Proceeds**") with the same validity, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs the Debtor may possess.

5.      All of the transactions contemplated by the Agency Agreement shall be protected by Section 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.    The transactions contemplated by the Agency Agreement are not subject to avoidance pursuant to Section 363(n) of the Bankruptcy Code.

6.      Unless otherwise ordered by the Court, all newspapers and other advertising media in which the Sale may be advertised and all landlords are directed to accept this Order as binding authority so as to authorize the Debtor and the Agent to consummate the Agency Agreement and to conduct the Sale at the Stores, including, without limitation, conducting and advertising of the Sale (at the contractual rates charged to the Debtor prior to the Petition Date) in accordance with the Agency Agreement, the Sale Guidelines, and this Order; and no further approval, license or permits of any governmental authority shall be required.

7.      Except as expressly provided herein or in the Sales Guidelines, and except as to any governmental unit of any state in which a Store is located (referred to herein as a "**State**") (as to which this paragraph shall not apply) or any other governmental unit when enforcing applicable tax, labor, employment, environmental and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "**General**

**Laws**"): no person or entity, including but not limited to any landlord or any federal governmental unit or any city, town, county, parish, or municipal or other local (referred to herein as "**Local**") governmental unit (as defined in Section 101(27) of the Bankruptcy Code), that was (i) served with a copy of the Motion or (ii) served with a copy of this Order that does not object pursuant to the provisions of this Order, shall in contravention of this Order take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Sale, or the advertising and promotion (including the use of signwalkers) of such Sale, and all such parties and persons of every nature and description, including landlords and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, or otherwise impeding the conduct of the Sale and/or (b) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the Debtor, the Agent, or the Debtor's landlords for the Stores, that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale as provided for herein and/or seek to recover damages for breach(es) of covenants or provisions in any lease or sublease based upon any relief authorized herein.

8.    The Debtor and the Agent are hereby authorized to take such actions necessary and appropriate to implement the Agency Agreement and to conduct the Sale without necessity of further order of this Court as provided by the Agency Agreement, including, but not limited to, advertising the Sale through the posting of signs (including the use of exterior banners) at (i) non-enclosed mall Stores, and (ii) enclosed mall Stores to the extent the applicable Store entrance does not require entry into the enclosed mall common area, use of sign walkers and

street signage, in accordance with the Agency Agreement and as otherwise provided in the Sale Guidelines.

9.    Provided that the Sale is conducted in accordance with the terms of this Order, the Sale Guidelines and the Agency Agreement, and in light of the provisions in the laws of many governmental units that exempt court-ordered sales from their provisions, the Debtor and the Agent shall be presumed to be in compliance with any GOB Laws (as defined herein) and, subject to paragraphs 13 through 17, are authorized to conduct the Sale in accordance with the terms of this Order, the Sale Guidelines and the Agency Agreement without the necessity of compliance with any such GOB Laws. For purposes of this Order, GOB Laws shall mean any federal, state or local statute or ordinance or licensing requirement solely directed at regulating store closing, "going out of business," liquidation, bankruptcy, auction or similar sales ("**GOB Sales**"), including laws restricting safe, professional and non-deceptive, customary advertising of GOB Sales, such as signs, banners, posting of signage, and use of sign walkers, and including ordinances establishing licensing or permitting requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply to the Sale ("**GOB Laws**"). For the avoidance of doubt, the Sale shall not be exempt from, and the Agent shall not be entitled to a presumption of compliance with laws other than GOB Laws, including General Laws.

10.    Subject to the provisions of paragraphs 9 and 13, Agent's use, in conformity with the Sale Guidelines and this Order, of (i) signwalkers; (ii) interior store signage and banners; and (iii) exterior banners ("**Banner and Signwalker Advertising**"), is authorized notwithstanding any lease provisions which purport to regulate, prohibit, restrict, or in any way limit such activity so long as such activity is undertaken by Agent in a safe, professional and non-deceptive manner. Any person (including without limitation any landlord but excluding any governmental

unit), that, after having received a copy of this Order, and after having been specifically advised in writing of the provisions of this Order, continues to interfere with Banner and Signwalker Advertising undertaken in compliance with this Order, shall be liable to the Agent and/or the Debtor and affected landlord(s) for any and all damages resulting from such continued interference.

11.    Except as otherwise provided in paragraphs 13 through 17, this Court shall retain exclusive jurisdiction to resolve any disputes regarding this Order and the actions authorized hereunder brought by or against any person, including (i) any claim or issue relating to any efforts to prohibit, restrict or in any way limit Banner and Signwalker Advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional and non-deceptive manner, (ii) any claim of the Debtor, the landlords and/or the Agent for protection from interference with the Sale and (iii) any other disputes related to the Sale or arising under the Agency Agreement or the implementation thereof. Except as provided in paragraph 13, no actions shall be taken by any person against the Debtor, the Agent, the landlords or the Sale until this Court has resolved such dispute. This Court shall hear any such disputes on an expedited basis, as may be appropriate under the circumstances.

12.    Except as expressly provided in the Agency Agreement, the Sale at the Stores shall be conducted by the Debtor and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sale, the rejection of leases, abandonment of assets or "going dark" provisions; provided, however, that nothing in this Order shall impact any objection that any of the Debtor's landlords may have to assumption, assignment or rejection of their respective lease or to any

proposed cure amount or rejection damages claim in association with such assumption, assignment or rejection.

13.    Nothing in this Order shall be deemed to bar any governmental unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtor's or Agent's right to assert that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Order or otherwise, pursuant to paragraph 17. To the extent reasonably practicable, each applicable governmental unit shall provide the Debtor and Agent and any affected landlord with reasonable notice and opportunity to cure any alleged violation of any applicable law or regulation prior to instituting formal administrative or judicial proceedings; provided, however, cessation of alleged unlawful conduct after notice shall not, in and of itself, render moot court action by any State, including the imposition of injunctive relief, even if the Debtor or the Agent has ceased the alleged unlawful conduct.  No party waives any rights to argue any position with respect to whether the conduct was in compliance with this Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Order shall be deemed to have made any rulings on any such issues.

14.    The Debtor shall serve copies of this Order within five (5) business days, via first class mail, upon (i) the State Attorney General's offices (upon (x) Chief or Director of the Consumer Protection Division or Bureau; and (y) Chief or Director of the Bankruptcy Division or Bureau) and State Consumer Protection Agency for each State, and (ii) the Local mayor or similar official representative of each village, town or city, and the county or parish where a Store is located, addressed to the attention of the municipal, city or county attorney, in each case to the consumer protection division.

15.     If there is a dispute as to whether the general conduct of the Sale is in accordance with this Order, the Agency Agreement or the Sales Guidelines or would violate a GOB Law and should be limited or barred (a **"Reserved Dispute"**), resolution of that Reserved Dispute will take place before this Court, as provided in this paragraph. Any time before the fifteenth (15th) day following the service of this Order as provided for in paragraph 14, any governmental unit may assert a Reserved Dispute by sending a notice explaining the nature of the dispute to counsel for the Debtor, the Agent and the Creditors' Committee. If the Debtor and the governmental unit are unable to resolve the Reserved Dispute within ten (10) days of receipt of the notice, either party may file a motion with the Court requesting resolution of the dispute (a **"Dispute Resolution Motion"**). Any such Dispute Resolution Motion shall also be served upon any affected landlord(s). Any issues relating to a Reserved Dispute shall not affect the finality of this Order or limit or interfere with the conduct of the Sale prior to any ruling by this Court on said Reserved Dispute.

16.     If such Dispute Resolution Motion is timely filed, the Debtor and/or the Agent shall be entitled to assert that the provisions of this Order and/or the conduct of the Sale do not violate the GOB Law, or, if they do, that such GOB Law is subject to preemption by the Bankruptcy Code. The governmental unit shall be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the validity of this Order, the requirements of its GOB Laws, or the lack of any preemption of such GOB Laws by the Bankruptcy Code. Nothing in this Order, including the presumption stated in paragraph 9, shall constitute a ruling with respect to any issues to be raised in the Dispute Resolution Motion, including whether the GOB Law is preempted by the Bankruptcy Code, whether the automatic

stay applies to any proposed action, or whether sovereign immunity applies to any action relating to a governmental unit.

17.    If at any time a dispute arises between the Debtor or the Agent and a governmental unit as to whether a particular law is a GOB Law and subject to any provisions contained in this Order related to GOB Laws, or whether enforcement of a conceded GOB Law may be preempted, then any party to that dispute may utilize the provisions of paragraphs 15 and 16 by sending a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a GOB Law shall be made *de novo* in accordance with the definitions in this Order.

18.    Throughout the Sale Term, the Agent shall have the right to use the Stores, all related Store services, furniture, fixtures, equipment and other assets of Debtor as designated in the Agency Agreement for the purpose of conducting the Sale, in each case solely in accordance with the provisions of the Agency Agreement.

19.    Until the Sale Termination Date, the Agent shall be granted a limited license and right to use the Debtor's trade names, logos and customer lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agency Agreement.

20.    Except as expressly provided for in the Agency Agreement, nothing in this Order or the Agency Agreement and none of the Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of the Debtor's obligations relating to any of the Debtor's employees. Moreover, Agent shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

21.    Except as set forth in the Agency Agreement, the Debtor and/or the Agent (as the case may be) are authorized and empowered to transfer assets among the Stores. Agent shall be permitted to include in the Sale as consigned goods the Additional Agent Merchandise in accordance with the terms and provisions of the Agency Agreement. At all times, title to the Additional Agent Merchandise shall remain with Agent and the Additional Agent Merchandise and the proceeds thereof, shall not constitute property of the estate of the Debtor.

22.    The Debtor grants to Agent, solely in accordance with the terms of the Agency Agreement, pursuant to Section 364(d) of the Bankruptcy Code a valid and perfected first priority security interest (subject to the subordination provisions set forth below in this Section) in and lien upon the Merchandise and the Proceeds to secure all obligations of Debtor under the Agency Agreement; provided, however, that until the payment of the Guaranteed Amount, Agent's security interest shall remain junior and subordinate in all respects to the liens, security interests and claims of the Lenders to the extent of the unpaid portion of the Guaranteed Amount, the Recovery Amount and Expenses. Upon entry of this Order and payment of the Initial Guaranty Payment and the issuance of the Guaranty L/C and the Expense L/C, the security interest granted to Agent shall be deemed properly perfected without the need for further filings or documentation.

23.    The provisions of this Order and the Agency Agreement and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan of reorganization of the Debtor or converting the Debtor's case from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement as well as the rights and interests granted pursuant to this Order and the Agency Agreement shall continue in this or any superseding case and shall be binding upon the Debtor, the Agent and their respective

successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtor under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed in this case shall be and hereby is authorized to operate the business of the Debtor to the fullest extent necessary to permit compliance with the terms of this Order and the Agency Agreement, and the Agent and the trustee shall be and hereby are authorized to perform under this Agreement upon the appointment of a trustee with the need for further order of this Court. In the event a chapter 7 trustee determines that it needs further order of this Court in connection with the continued operation of the business, such motion shall be heard on an expedited basis.

24.     To the extent that anything contained in this Order conflicts with a provision in the Agency Agreement or the Sale Guidelines, this Order shall govern and control. This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order or otherwise arising from or related to the Agency Agreement.

25.     The Agent shall not be liable for any claims against the Debtor, and the Debtor shall not be liable for any claims against the Agent, in each case, other than as expressly provided for in the Agency Agreement. The Agent shall have no successor liability whatsoever with respect to any Liens or claims of any nature that may exist against the Debtor.

26.     No bulk sale or similar law shall prohibit the Debtor or the Agent from taking action contemplated by the Agency Agreement.

27.     The Debtor, the Agent and each of their respective officers, employees and agents are hereby authorized to execute such documents and to do such acts as are necessary or

desirable to carry out the Sale and effectuate the Agency Agreement and the related actions set forth therein.

28.    Notwithstanding Bankruptcy Rules 4001 and 6004, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.  In the absence of any person or entity obtaining a stay pending appeal, the Debtor and the Agent are free to perform under the Agency Agreement at any time, subject to the terms of the Agency Agreement.

29.    The Agent is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Agency Agreement and the conduct of the Sale.

Dated: March ___, 2011
       Tampa, Florida


_____
UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT 11.1(c)

### Pre-Existing Liens

1.    Liens and Security Interests in favor of BOA.

2.    Liens and Security Interests in favor of the Second Lien Lender.

3.    Liens and Security Interests in favor of certain management investors (as described in the loan documents evidencing or securing the Lender's loans).

4.    Liens and Security Interests with respect to certain of the Merchandise as described in the schedules filed in the Merchant's bankruptcy case.

\* \* \* \* \* \* \*

9

## EXHIBIT 11.1 (l)

### Pending Matters

1.    The Merchant's bankruptcy case.

10

# Robb & Stucky
## EXHIBIT 11.1 (n)
### Inventory Adjustment

| Incremental Dollars in Merchandise | Cost Value of Merchandise | Guarantee $ | Guarantee % |
|---|---|---|---|
| 250,000 | 48,100,000 | 35,788,600 | 74.4% |
| 250,000 | 47,850,000 | 35,699,600 | 74.6% |
| 250,000 | 47,600,000 | 35,610,600 | 74.8% |
| 250,000 | 47,350,000 | 35,521,600 | 75.0% |
| 250,000 | 47,100,000 | 35,432,600 | 75.2% |
| 250,000 | 46,850,000 | 35,293,600 | 75.3% |
| 250,000 | 46,600,000 | 35,139,600 | 75.4% |
| 250,000 | 46,350,000 | 34,975,600 | 75.5% |
|  | 46,100,000 | 34,851,600 | 75.6% |
|  | 40,500,000 | 30,618,000 | 75.6% |
| (500,000) | 40,000,000 | 30,115,000 | 75.3% |
| (250,000) | 39,750,000 | 29,876,000 | 75.2% |
| (250,000) | 39,500,000 | 29,662,000 | 75.1% |
| (250,000) | 39,250,000 | 29,398,000 | 74.9% |
| (250,000) | 39,000,000 | 29,134,000 | 74.7% |
| (250,000) | 38,750,000 | 28,870,000 | 74.5% |
| (250,000) | 38,500,000 | 28,606,000 | 74.3% |

Adjustment for Cost Value more than 48.1M or less than $38.5M will be mutually agreed to
Adjustments between increments will be prorated.

# Robb & Stucky
## EXHIBIT 11.1 (o)
### Inventory Mix

| Department | % of Cost<br>Value of Inventory |
|---|---|
| FURN CG DR WOOD | 17.0% |
| FURN CG BR WOOD | 12.0% |
| FUR CG OC/TR WD | 10.0% |
| ACCESSORIES | 6.0% |
| FUR CG OC/MD WD | 6.0% |
| PICTURES | 5.5% |
| FUR UPH TRA SOF | 5.0% |
| LINENS | 4.5% |
| LAMPS | 4.0% |
| DESKS - HOME OFFICE | 3.5% |
| FUR CG W/S CONT | 3.0% |
| PATIO-CAST ALUMINUM | 3.0% |
| FUR UPH CON CHR | 2.0% |
| PATIO-WICKER | 2.0% |
| FUR UPH CON SOF | 2.0% |
| MIRRORS | 2.0% |
| HOME-ACCESSORIES | 1.5% |
| FUR UPH W/R LR | 1.5% |
| All Others | 9.5% |
| | |
| Total | 100.0% |